Argued January 17, affirmed April 17, argued on rehearing October 16, 1923, reversed and remanded January 14, rehearing denied February 13, costs taxed March 4, 1924.

# PHIPPS *v.* STANCLIFF.

(214 Pac. 335; 222 Pac. 328.)

**Public Lands—State Courts will not Interfere With Land Department Proceedings.**

1. The courts of the state will not entertain proceedings involving the title to land owned by the United States where proceedings involving such title are pending in the United States Land Department, and still undetermined, since the Enabling Act and Act of June 3, 1859 (1 Or. L., p. 30), expressly stipulate that the state shall never interfere with the primary disposal of the soil within the state by the United States.

**Public Lands—Findings of Land Department Conclusive.**

2. In the disposal of public lands, the findings of officers of the United States Land Department within the scope of their authority are conclusive.

**Public Lands—United States cannot be Made Party to Action Under State Statute.**

3. Under Section 41, Or. L., providing that the court may determine any controversy between parties before it when it can be done without prejudice to the rights of others, or by saving rights, and that, when a complete determination of the controversy cannot be had without the presence of other parties, the court shall cause them to be brought in, *held* that, since the United States cannot be brought in as a party in a proceeding involving the title

---

1. Jurisdiction of state courts over lands of United States, see note in 17 L. R. A. 720.

2. Conclusiveness of decisions or findings of Land Department, see note in Ann. Cas. 1918D, 597.

to land claimed by defendant as a homestead entryman and by plaintiff under a railroad land grant, the court must dismiss the action.

ON REHEARING.

**Public Lands—Title to Railroad Grant Attaches on Location of Line.**

4. Title of a railroad to public lands granted it in aid of construction attaches as soon as a line of its road has been definitely located, though no patent is issued.

**Adverse Possession—Railroad Land Grants may be Lost by Adverse Possession.**

5. Lands of a railroad granted to it by the United States, exclusive of right of way, and similar lands may be acquired as against the railroad by adverse possession, which begins to run in favor of occupant when title passes to the company, though patent to it is not issued until later.

**Adverse Possession—Railroad's Loss of Title by Adverse Possession a "Conveyance."**

6. A railroad's loss of title to land granted it by the government by adverse possession of another constitutes a "conveyance" within the meaning of the granting act.

**Public Lands—Railroad may Convey Good Title.**

7. Since government land grants in aid of railroads were for the express purpose of being disposed of to individuals, an intent must be imputed to Congress to vest the railroads with such title that they could transfer to their grantees a good and complete title.

**Adverse Possession—Lands Granted to Railroad Held Lost by Adverse Possession Before Title Became Absolute or Patent Granted.**

8. One possessing land granted to a railroad by the government adversely for the statutory period, after the railroad by locating its line had acquired title, *held* to have acquired the railroad's title thereto as completely as though same had been conveyed to him, notwithstanding the railroad's ownership had not yet become absolute by completion of its line or a patent issued to it.

**Public Lands—Government may not Deprive Railroad of Title Under Patent.**

9. After the United States, by approval of a railroad's report that it has completed its line, issues a patent for lands granted in aid of it, the title of the railroad cannot be retaken by the United States, unless the grant reserved some title or interest paramount to the railroad's, or imposed conditions or covenants, remedies for the violation of which operated to reinvest the United States with title.

See 2 C. J., pp. 216, 217, 254; 23 C. J., pp. 351, 746; 32 Cyc. 940, 947, 967, 979, 1008.

Public Lands—Railroad's Title Lost by Adverse Possession Held not Subject to Forfeiture.

10.  Chamberlain-Ferris Act of June 9, 1916, declaring a forfeiture of lands granted to a railroad and then remaining unsold, because of violations of the "settlers' clause," fixing the price for which and the quantities in which the land so granted could be sold, *held* not to reinvest the government with title to land which, though unsold by the railroad, had been lost by it through adverse possession of another, Congress being without power to either deprive the railroads of any vested right under the grant or to divest another of title claimed through the railroad.

Execution on Judgment can Only Reach Interests of Judgment Creditor.

11.  Execution on a judgment can only reach the interest of the judgment creditor.

Public Lands—Grant to Railroad Held not to Reserve Any Title.

12.  The provisions of act of Congress of July 25, 1866, as amended by act of Congress of April 10, 1869, granting public lands in aid of the Oregon & California Railroad Company, which reserved to Congress the right to "add to, alter, amend, or repeal this act," *held* not a reservation of any title or estate in the lands.

Constitutional Law—Vested Rights cannot be Disturbed by Amendment or Repeal.

13.  The authority of Congress to alter, amend or repeal an act is subject to the limitation that rights vested or transactions fully consummated cannot be disturbed.

Public Lands—Proceedings in Land Department Held not to Defeat State Court's Jurisdiction of Adverse Claims.

14.  Where a claimant of land once a part of a public land grant to a railroad is shown to have acquired complete and absolute title against the railroad by adverse possession, an attempt of the Land Department of the United States to exercise jurisdiction over the same on the theory that title had been reinvested by statute in the government is unauthorized and a nullity, and does not preclude determination by the state courts of adverse claims to the property.

From Douglas: J. W. HAMILTON, Judge.

Department 2.

This is an action for the possession of lot 9 of section 33, Tp. 38 S., R. 6 W., W. M., in Douglas County, Oregon. The Circuit Court dismissed the action. Defendant appeals.                    AFFIRMED.

For appellant there was a brief and oral argument by *Mr. B. L. Eddy.*

For respondent there was a brief and oral arguments by *Mr. Carl E. Wimberly* and *Mr. Guy Cordon.*

BEAN, J.—The lot is a part of the lands granted to the Oregon & California Railroad Company by the Act of Congress of July 25, 1866, and the amendments thereto. These acts contain provisions requiring the sale of the lands to actual settlers in tracts of not more than 160 acres, or one-quarter section, to each purchaser at prices not to exceed $2.50 per acre, and reserving to Congress the right to alter, amend or repeal the acts, having due regard for the rights of the grantee companies.

On April 30, 1908, the Congress adopted a joint resolution, authorizing and directing the Attorney General of the United States to institute and prosecute any and all suits in equity, actions at law or other proceedings, to enforce any rights or remedies of the United States arising or growing out of either or any of the granting acts and their amendments, namely: Act of July 25, 1866, 14 Stats. at L. 239, Chap. 242; Act of June 25, 1868, 15 Stats. at L. 80, Chap. 80; Act of April 10, 1869, 16 Stats. at L. 47, Chap. 27; Act of May 4, 1870, 16 Stats. at L. 94, Chap. 69.

Asserting that the Oregon & California Railroad Company had violated the terms of the grant, the United States brought suit to declare a forfeiture of the granted lands including the land involved in the present case. This suit reached its finality in the United States Supreme Court in the case of *Oregon & California R. R. Co. et al.* v. *United States,* 238 U. S. 393 (59 L. Ed. 1360, 35 Sup. Ct. Rep. 908, see, also, Rose's U. S. Notes), and 243 U. S. 549 (61 L. Ed. 890, 37 Sup. Ct. Rep. 443). On June 21, 1915,

the United States Supreme Court held in effect that the provisos of the land grant requiring the granted lands to be sold by the railroad companies only to actual settlers in quantities not exceeding 160 acres each, and at a price not exceeding $2.50 per acre, were not conditions subsequent, the violation of which resulted in forfeiture of the grants, but were covenants which are enforceable. The United States Supreme Court enjoined any disposition of the lands until Congress should have a reasonable opportunity to provide by legislation for their disposition in accordance with such policy, as it might deem fitting under the circumstances, and at the same time secure to the defendants, the railroad companies, all the value the granting acts conferred upon the railroads.

Pursuant to these decisions the Congress passed the Act of June 9, 1916, known as the Chamberlain-Ferris Act, 39 Stats. at L. 218, Chap. 137, revesting in the United States title to all the granted lands which had not been sold prior to July 1, 1913, but preserving the rights of the railroad company which were declared to be $2.50 per acre, and declaring the terms upon which such revested lands might be entered under the public land laws by qualified persons.

Pursuant to the provisions of the Chamberlain-Ferris Act portions of the revested lands, including the tract involved herein, were classified as agricultural lands, and listed and advertised as open to entry by the public with a preferred right to honorably discharged soldiers, sailors and marines. Frank L. Stancliff, the defendant, exercising his preferred right as an honorably discharged soldier, made a homestead entry under the United States land laws for lot 9 in the Roseburg land office, and proceeded to occupy and improve the land. Plaintiff thereafter

brought this action to eject the defendant, the complaint being in the usual form. The answer avers the granting and patenting of lot 9 to the railroad company, its revestment in the United States through the Chamberlain-Ferris Act, and the homestead entry of defendant and his occupancy of the land under such entry. Lot 9 is surrounded by lands which were in private ownership prior to the grant to the railroad company.

The reply admits the homestead entry of the land by defendant, and his possession; denies the other allegations of the answer and affirmatively alleges: That the land lies within the primary limits of the railroad grant, being in an odd-numbered section within the twenty-mile limits covered by the grant; that the railroad company definitely located that part of its road opposite the land January 7, 1871; that the road was actually completed opposite the land and accepted by the United States on August 29, 1883, and the railroad company was thereupon entitled to patent; that patent was issued to the company May 28, 1902, but that the patent did not convey title; that the lot in question is part of the southeast quarter of section 33; that in the year 1878, Robert Phipps, grantor and predecessor in interest of the plaintiff, was in the actual, exclusive, notorious, peaceable and adverse possession of the lot, claiming title thereto under a chain of conveyances from his predecessors, extending from the year 1863, down to and including a conveyance from one Harkness, dated October 23, 1878, under which Phipps went into possession; that Robert Phipps continued in like possession of the lot, having the same under fence and farming it, from that time to on or about March 9, 1912, when he placed plaintiff in possession under

a deed dated March 9, 1912, and from that time till about September 19, 1920, when defendant wrongfully took possession, plaintiff continued in possession, having the land under fence and farming the same, and claiming to own it against all the world. The reply further alleges that the plaintiff and his grantors and predecessors in interest have, since the year 1863, until defendant wrongfully took possession, been in the actual, adverse, hostile, exclusive, open, notorious and continuous possession of lot 9, holding and owning and claiming to own the same adversely to all the world; that title to the lot was not vested in the Oregon & California Railroad Company at the time of the passage of the Chamberlain-Ferris Act, or at any time after the year 1881.

The defendant demurred to the reply. The court sustained the demurrer, and, plaintiff refusing to plead further, judgment was entered for defendant.

The lot in question was described in the suit above mentioned in the federal court, and it is apparent that the record title to the lot is in the government of the United States, and that the Department of the Interior of the United States, through the United States land office, granted defendant's homestead entry. The United States, therefore, has a claim to the land in question. There has been no adjudication of the claim of plaintiff to the land as between the United States and the plaintiff.

1. In the act of Congress admitting Oregon into the Union it is provided:

"That the foregoing propositions, hereinbefore offered, are on the condition that the people of Oregon shall provide by an ordinance, irrevocable without the consent of the United States, that said state shall never interfere with the primary disposal

110 Or.—20

of the soil within the same by the United States, or
with any regulations Congress may find necessary
for securing the title in said soil to *bona fide* pur-
chasers thereof \* \* ." 1 Or. L., p. 27.

The legislative assembly of the State of Oregon,
by an act approved June 3, 1859, accepted the propo-
sition of the United States, and solemnly ordained
that the state "shall never interfere with the primary
disposal of the soil within the same by the United
States," and that it would conform to the requirement
of the Congress of the United States above quoted:
1 Or. L., p. 30.

In the opinion in *Pin* v. *Morris,* 1 Or. 230, a case
involving a portion of a donation of land claim, Mr.
Chief Justice WILLIAMS said:

"Congress has organized a land department of the
government, whose business it is made to determine
those questions which arise out of the disposal of
the public lands, and the courts of the country cannot
interfere to regulate or control that business, without
introducing uncertainty and confusion into the whole
system."

In *Moore* v. *Fields,* 1 Or. 317, the syllabus reads:

"The courts of this State will entertain no proceed-
ings, arising out of facts still pending in, and un-
determined by, the land department of the United
States."

This policy has been strictly adhered to ever
since: *Frink* v. *Thomas,* 20 Or. 265 (25 Pac. 717, 12
L. R. A. 239); *Robertson* v. *State Land Board,* 42 Or.
183 (70 Pac. 614); *Weatherford* v. *McKay,* 59 Or. 558
(117 Pac. 969); *State ex rel.* v. *Hyde,* 88 Or. 1, 40
(169 Pac. 757, 171 Pac. 582, Ann. Cas. 1918E, 688).
See, also, *Catholic Bishop* v. *Gibbon,* 158 U. S. 155
(39 L. Ed. 931, 15 Sup. Ct. Rep. 779, see, also, Rose's
U. S. Notes).

2. As to all matters of fact within the scope of the authority of the officers of the United States land district, their findings are conclusive: *Sanford* v. *Sanford,* 19 Or. 1; affirmed in 139 U. S. 642 (35 L. Ed. 290, 11 Sup. Ct. Rep. 666, see, also, Rose's U. S. Notes); *Johnson* v. *Townsley,* 13 Wall. 72 (20 L. Ed. 485); *Moore* v. *Robbins,* 96 U. S. 530 (24 L. Ed. 848); *Smelting Co.* v. *Kemp,* 104 U. S. 636 (26 L. Ed. 875).

The government of the United States by its Department of the Interior and Land Department, with the sanction of the federal Supreme Court, says in effect, that title to the lot in question which was granted to the Oregon & California Railroad Company in aid of its railroad, by virtue of the Act of July 25, 1866, and the amendments thereto, pursuant to the plan suggested by the Supreme Court of the United States and carried out by the Chamberlain-Ferris Act, revested in the United States and was subject to entry under the homestead laws by the defendant.

The plaintiff says in substance, that the title to the land was not so revested in the United States and was not subject to defendant's homestead entry. It does not appear that this question has ever been presented to the United States Land Department.

It would not be in conformity with the enabling act of Congress admitting Oregon into the Union or the ordinance of the legislative assembly of the state accepting the propositions of Congress in that regard, nor in accordance with the long established policy of the courts, to interfere in the disposal of the lot of land in question. We are unable to see how the court could do so without the presence of the United States government as an interested party herein.

3. Section 41, Or. L., provides that the court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy cannot be had without the presence of other parties, the court shall cause them to be brought in. As the government of the United States cannot be brought in as a party to this suit the only alternative is to dismiss the action: *Beasley* v. *Shively*, 20 Or. 508 (26 Pac. 846).

If plaintiff's contention could be acceded to, it would result in utter confusion. If the defendant should be dispossessed by the court, the Land Department might adhere to its present program, resulting in a perplexing question as to the issuance of a patent for the land. The judgment of the Circuit Court sustaining the demurrer to the reply is affirmed.

For the reason suggested the action is dismissed without prejudice to plaintiff's rights.　　Affirmed.

McBride, C. J., and Brown and McCourt, JJ., concur.

---

Reversed and remanded on rehearing January 14, 1924.

ON REHEARING.

(222 Pac. 328.)

REVERSED. REHEARING DENIED. COSTS TAXED.

For appellant there was a brief and oral argument by *Mr. B. L. Eddy.*

For respondent there was a brief over the name of *Messrs. Wimberly & Cordon.*

McCOURT, J.—This is an action in ejectment. The title asserted by plaintiff is based on adverse possession. The land in controversy is a forty-acre tract, located within the limits of the grant of public lands to the Oregon & California Railroad Company, made by act of Congress, approved July 25, 1866 (14 U. S. Stats. at L. 239), as amended by the Act of April 10, 1869 (16 U. S. Stats. at L. 47). Legal title to the lands in question passed to the railroad company in 1871 upon the definite location of its line of road: *Deseret Salt Co.* v. *Tarpey,* 142 U. S. 241 (35 L. Ed. 999, 12 Sup. Ct. Rep. 158, see, also, Rose's U. S. Notes).

Plaintiff contends that the railroad company fully earned the grant and became vested with the absolute title to the lands upon the completion of its railroad line opposite the land in question in 1883. The possession upon which plaintiff relies became adverse to the railroad company when the legal title passed to it in 1871, and continued without interruption to and beyond the time of the completion of the railroad line, and if the above contention of plaintiff is correct, the adverse possession of plaintiff's predecessor ripened into perfect title as against the whole world upon the expiration of the period of ten years from the date of its initiation, and plaintiff having acquired that title by deed, could not be deprived thereof by act of Congress, or otherwise.

Thirty-five years thereafter, and on June 9, 1916, Congress passed an act (39 U. S. Stats. at L. 218), known as the Chamberlain-Ferris Act, purporting to revest the United States with "title to so much

of the lands granted" to the railroad company "as
had not been sold by the Oregon and California Rail-
road Company prior to July first, nineteen hundred
and thirteen."

Defendant was allowed to enter the land as a home-
stead by the United States land office at Roseburg,
Oregon, and thereafter, on the nineteenth day of
September, 1920, defendant entered into the posses-
sion of the land, and has since retained the same for
the purpose of perfecting his homestead entry. De-
fendant insists that, as against those acquiring title
from the Railroad Company, the United States, by
the terms of the grant, retained paramount title to
the granted lands, and upon assertion of that title
by the Chamberlain-Ferris Act, plaintiff's title was
destroyed.

An examination of some of the decisions of the
Supreme Court of the United States, in cases involv-
ing the land grant above mentioned and similar grants
in aid of the construction of railroad and telegraph
lines, will aid in the determination of the above con-
tentions of the parties.

Between 1862 and 1875 Congress made numerous
grants of public lands in aid of the construction of
what is generally known as the Pacific railroads and
telegraph lines. Among such grants were the follow-
ing: The Union Pacific grant, including Central Pa-
cific and other branch lines, 12 U. S. Stats. at L. 489,
as amended by 13 U. S. Stats. at L. 356; New Or-
leans Pacific grant, including Texas Pacific and other
branch lines, 16 U. S. Stats. at L. 579; Northern
Pacific grant, 13 U. S. Stats. at L. 365; Oregon Cen-
tral Railroad Company grant, 16 U. S. Stats. at L.
94.

The granting clause in each of the last-mentioned grants was substantially the same as in the grant to the Oregon & California Railroad Company, and each granting act contained a provision to the effect that Congress might add to, alter, amend or repeal the act, having due regard for the rights of the grantee named therein.

In each of such grants it was the intention of the United States, expressed in the granting act, that the grantee should sell and dispose of to individuals, in relatively small tracts, all the lands conveyed to it by the grant, excepting only its right of way and such lands as were necessary for the company to reserve for depots, stations, sidetracks, wood-yards, standing grounds and other needful uses in operating the road, which latter lands it was intended should be permanently devoted to railroad purposes for the benefit of the public.

4. In determining the character and extent of the title acquired by the railroad company under any of the grants referred to, the Supreme Court of the United States has uniformly held that the words of the granting act imported a grant *in praesenti* and transferred to the grantee legal title, as distinguished from an equitable or inchoate interest in the lands; that when the line of its road was definitely located by the grantee, the grant attached to particular lands within its limits with the same effect as if the lands had been specifically described in the grant, notwithstanding patent had not issued, and that thereupon the title of the grantee was so far complete as to authorize it to take possession and make use of the lands, and entitled the grantee to maintain an action for such possession against intruders: *Deseret Salt Co.* v. *Tarpey,* 142 U. S. 241 (35 L. Ed. 999, 12 Sup.

Ct. Rep. 150, see, also Rose's U. S. Notes), and cases cited therein; *Bybee* v. *Oregon & Cal. R. Co.,* 139 U. S. 663 (35 L. Ed. 305, 11 Sup. Ct. Rep. 641); *St. Paul R. Co.* v. *Northern Pac. R. Co.,* 139 U. S. 1 (35 L. Ed. 77, 11 Sup. Ct. Rep. 389), and cases cited therein.

5. It is also firmly established by the Supreme Court of the United States that title to the general lands of a railroad company, granted to it by the United States, not including its right of way and similar lands, may be acquired as against the company by adverse possession, and that the statute begins to run from the time when title passes, even though patent has not been issued: *Toltec Ranch Co.* v. *Cook,* 191 U. S. 532 (48 L. Ed. 291, 24 Sup. Ct. Rep. 166, see, also, Rose's U. S. Notes); *Iowa R. Land Co.* v. *Blumer,* 206 U. S. 482 (51 L. Ed. 1148, 27 Sup. Ct. Rep. 769); *Missouri Valley Land Co.* v. *Wiese,* 208 U. S. 234 (52 L. Ed. 466, 28 Sup. Ct. Rep. 294).

*Toltec Ranch Co.* v. *Cook, supra,* involved a grant of lands to the Central Pacific Railroad Company, made by act of Congress of July 1, 1862 (12 U. S. Stats. at L. 489), as amended by Act of July 2, 1864 (13 U. S. Stats. at L. 356). The action was in ejectment; plaintiff based his title on adverse possession, initiated and continued for the period prescribed by the statute of limitations of Utah, before patent was issued by the United States to the railroad company. The defendant claimed title by deed from the railroad company. The court sustained the claim of title by adverse possession, and speaking through Mr. Justice McKENNA, said:

"The question presented is whether adverse possession under claim of right for the period prescribed by the statute of limitations of Utah before patent was issued by the United States can prevail against

the latter. It has been decided by this court that adverse possession of land gives title to it and all of the remedies which attach to the title. This was expressly ruled in *Sharon* v. *Tucker,* 144 U. S. 533 (36 L. Ed. 532, 12 Sup. Ct. Rep. 720). * *

"Adverse possession, therefore, may be said to transfer the title as effectually as a conveyance from the owner; it may be considered as tantamount to a conveyance. And the Central Pacific Railroad Company had the title. *Deseret Salt Co.* v. *Tarpey,* 142 U. S. 241 (35 L. Ed. 999, 12 Sup. Ct. Rep. 158). It would seem, therefore, an irresistible conclusion that it could have been transferred by any of the means which the law provided."

*Iowa R. Land Co.* v. *Blumer, supra,* involved a tract of land included in the grant made by the act of Congress of May 15, 1856 (11 U. S. Stats. at L. 9), to the state of Iowa, in aid of the construction of certain railways in that state, which lands were later granted by the state of Iowa to the Iowa Falls and Sioux City Railway Company, which company in turn had conveyed the lands to the Iowa Railroad Land Company. Plaintiff brought the suit for the purpose of quieting the title to forty acres, and claimed title in himself by adverse possession for more than ten years. Two defenses were urged. First, that under the terms of the grant the legal title did not pass from the government until the completion of the road; and second, that the predecessor in interest of the plaintiff (Carraher), during his possession of the premises, attempted to effect a timber culture entry upon the lands in the general land office of the United States, and thereby recognized title in the United States, which act, it was claimed, precluded plaintiff, his successor, from using that possession in support of his claim of adverse possession.

Plaintiff prevailed. Rejecting the first defense, the court, speaking through Mr. Justice DAY, said:

"But when the grant is *in praesenti,* and nothing remains to be done for the administration of the grant in the Land Department, and the conditions of the grant have been complied with and the grant fully earned, as in this case, notwithstanding the want of final certification and the issue of the patent, the railroad company had such title as would enable it to maintain ejectment against one wrongfully on the lands, and title by prescription would run against it in favor of one in adverse possession under color of title."

Answering the second defense, the court said:

"After 1891, as we have seen, the railway company was in position to have ousted him (Carraher) from the premises and asserted its superior title and right. It did not attempt to do this, and, so far as the record discloses, made no objection to Carraher planting and cultivating the trees required by the act of Congress to perfect his title under the second application. His possession was certainly open, notorious, continuous, and adverse, and, unless he was acting in bad faith, was such as would ripen into full title as against the railway company. * * And for more than ten years that company was in such position under its grant that it might have maintained an action in ejectment and asserted its title to the premises as against Carraher."

*Missouri Valley Land Co.* v. *Wiese, supra,* was a suit to quiet title, and involved grants of land made to the Union Pacific and Sioux City & Pacific Railroad Company by act of Congress of July 1, 1862 (12 U. S. Stats. at L. 489), and the amendatory Act of July 2, 1864 (13 U. S. Stats. at L. 356). The grants overlapped. The suit concerned a forty-acre tract within an overlap. Both the Union Pacific Company and the Sioux Company claimed the land,

and the General Land Office took the position that it was excepted from both grants and subject to an indemnity school selection made by the state of Nebraska. A long drawn-out controversy ensued, and in the meantime on December 1, 1882, the Union Pacific sold, and in 1887, after completion of the payment for the same, conveyed the land to John Japp, plaintiff's predecessor, by warranty deed. Japp went into and remained in open, continuous and adverse possession of the land, farming the same until February 28, 1891, when he sold it to the plaintiff. The adverse possession commenced by Japp was thereafter continued by plaintiff. Japp attempted to obtain title to the land from the United States, and was permitted to enter the same under the provisions of the act of March 3, 1887 (24 U. S. Stats. at L. 556), which provided, among other things, that a *bona fide* purchaser of lands forming part of a railroad grant, but, which for any reason had been excepted from the grant, might make payment to the United States for the lands and obtain a patent therefor. Later the school indemnity selection was canceled by the General Land Office; Japp's application was rejected and his entry canceled, and finally, on May 17, 1898, it was determined by the Department of the Interior that a patent should be issued to the companies jointly. Wiese thereupon, and before the above-mentioned patent had been issued, brought this suit against the above-mentioned companies and the Missouri Valley Land Company, the successor of one of them, in a District Court of Nebraska, to quiet his title to the tract. The Union Pacific Company disclaimed any interest in the lands, and the other defendants resisted the suit upon the grounds: (1) That the title of the Sioux Company remained in the United States until patent

was issued in 1903, and (2) That during the pendency of the entry of Japp allowed by the General Land Office upon his application to purchase the lands under the act of Congress of March 3, 1897, the possession relied upon by plaintiff was in no sense adverse, but was in subserviency to the title of the United States.

The District Court gave a decree, adjudging that plaintiff had a perfect title to the land. That decree was affirmed by the Supreme Court of Nebraska. An appeal was taken from the latter court to the Supreme Court of the United States, where the decree of the state court was affirmed in an opinion delivered by Mr. Chief Justice WHITE. The learned Chief Justice, after reciting the facts relating to the above-mentioned controversy respecting the title to the lands and stating the contentions of defendants made in the state courts, said:

"The plaintiff, by his reply, in substance alleged that the grants were *in praesenti,* and that the effect of the completion of the railroads and compliance with all the terms and conditions of the act prior to January 1, 1870, operated to pass the title of the government on or prior to that date, and that the General Land Office had not thereafter jurisdiction in respect to such lands, and that the adverse possession of the plaintiff was not affected by the proceedings had in the Land Department concerning such land.

"The cause was submitted to the court on the pleadings and evidence, and a decree was entered adjudging that Wiese had a perfect title to the tract. The supreme court of Nebraska affirmed the decree (77 Neb. 40, 108 N. W. 175), holding, in substance, that the grant to the two companies of the tract in controversy was *in praesenti,* that the title of the companies attached upon the definite location of their lines of road, and that the adverse possession of

Wiese and his grantor, commencing in 1882, had completely barred any claims of the companies to the property. * *

"That the decision of the court below was right, as applied to the land within the place limits of the main line grant made to the Union Pacific Railroad Company by the act of 1862 and the amendatory act of 1864, is not an open question. This is so, since it has been expressly held that the main line grant was one *in praesenti,* that the grantee company had a right to bring ejectment for such land after the definite location of its road, and that consequently, from the time of such definite location, a possession might be acquired by a third party to land embraced within the grant, which would be adverse, even as to the railroad company, and bar its title if possession was continued for the statutory length of time."

The Sioux City & Pacific Railroad Company was a branch road, and it was claimed that the branch line grant could not be held to have been a grant *in praesenti.* The Chief Justice made it clear that the legal title passed to the branch line on the definite location of the road, just as it did in the case of the main line, and then continued:

"That the entry and holding of the land by Japp, the grantor of Wiese, under the purchase by Japp in 1882, and the continued possession by Wiese after he acquired the land from Japp, should be deemed to have been adverse to the title in possession of the Sioux City Company, if the possession by Japp was not that of a cotenant, and such possession was unaffected by the proceedings had in the Land Office subsequent to 1882, is not questioned. We are clearly of opinion that the possession of Japp and his grantee was adverse in the strictest sense of the term, and the acts of Wiese in seeking to acquire title from the United States under the Act of 1887, with the view of removing a cloud upon his title, was not an

act of recognition or acknowledgment of a superior title, either in the United States or in the Sioux City Company, operating to interrupt the continuity of his adverse possession, and, in any event, cannot be held to have destroyed a title which had already become perfect by the expiration of the statutory period in Nebraska for acquiring the legal title to land by adverse possession."

The rule established by the foregoing cases was applied in the case of *Northern Pac. R. Co.* v. *Ely,* 197 U. S. 1 (49 L. Ed. 639, 25 Sup. Ct. Rep. 1302), where it was held that the word "conveyances" as used in an act of Congress included transfer of title by adverse possession. That suit was commenced by the railroad company to quiet title, remove clouds and to recover possession of numerous parcels of real estate alleged to be portions of its right of way in the State of Washington. The railroad company acquired the right of way by congressional grant, and as granted, the same was four hundred feet in width. Some of the defendants had been in possession of the land, claiming the same adversely to the railroad company for more than ten years prior to April 28, 1904. The railroad company prior to that date had deeded to numerous other parties, parcels of land within the four hundred feet right of way, but as it could not lawfully dispose of any part of its right of way to individuals for private purposes (*Northern Pac. R. Co.* v. *Townsend,* 190 U. S. 267 (47 L. Ed. 1044, 23 Sup. Ct. Rep. 671), Congress, on the last-mentioned date, approved an act (33 U. S. Stats. at L. 538), by the terms of which the width of the right of way was reduced to two hundred feet, and conveyances of land forming part of the right of way theretofore made by the railroad com-

pany were "legalized, validated and confirmed." The Townsend case held that title to the right of way could not be acquired by adverse possession, but the above act did not refer to transfer of title in that manner.

Mr. Chief Justice FULLER, delivering the opinion of the court, said:

"So far as title to portions of the right of way could be lawfully acquired from the railway company defendants below, appellees in the supreme court, had acquired title to their parcels by adverse possession, and occupied the same position as if they had received conveyances, which the act of April 28, 1904, operated to confirm."

The Chief Justice introduced the foregoing statement with a quotation from the opinion in the case of *Toltec Ranch Co.* v. *Cook,* 191 U. S. 532, 538 (48 L. Ed. 291, 292, 24 Sup. Ct. Rep. 166, 167):

"Adverse possession, therefore, may be said to transfer the title as effectually as a conveyance from the owner; it may be considered as tantamount to a conveyance."

6. In this state, the rule as to adverse possession conforms, in all respects, to that announced by the Supreme Court of the United States in the decisions referred to above: *Westervelt* v. *Risley,* 108 Or. 652 (218 Pac. 751, 752); *Anderson* v. *Richards,* 100 Or. 641 (198 Pac. 570), in which the earlier Oregon cases are collected and cited.

7. As hereinbefore stated, it was the purpose of the grant expressed herein that the granted lands, including the tract involved in the instant case, should be disposed of by the railroad company to individuals, and of course there must be imputed to Congress an intention to vest the railroad company

with such title as was essential to enable it to transfer to its grantees a good and complete title to the land. And, as said in *Toltec Ranch Co.* v. *Cook, supra,* that transfer might be accomplished "by any of the means which the law provided."

And presently, when we come to consider the provisions of the grant, the violation of which by the railroad company culminated in the passage of the Chamberlain-Ferris Act, it will be found that such violations occurred long after the adverse possession of plaintiff's predecessor had ripened into a perfect title; that plaintiff's predecessor, by his occupation and possession of the land, brought himself within the class of persons to whom, by the terms of the grant, the railroad company was directed and required to sell the land, and the limitations as to quantity (not more than one hundred and sixty acres), and price (not exceeding $2.50 per acre), were not exceeded; and finally, that title was perfected in plaintiff's predecessor, without any violation of the terms of the grant, either by plaintiff's predecessor or by the railroad company, but in strict conformity thereto.

It appears from plaintiff's reply that the tract of land involved in the instant case lies within the place limits of the grant to the Oregon & California Railroad Company; that the line of the railroad was definitely located prior to January 7, 1871, on which date the map of survey and definite location of the road was accepted and approved by the Secretary of the Interior of the United States; that the railroad and telegraph line was actually completed and the grant fully earned by the railroad company prior to August 29, 1883, and on that date the report of the railroad company, that the road was completed,

was accepted and approved by commissioners appointed by the President in accordance with the requirements of the granting act, which said commissioners had theretofore examined the line; that the grant having been fully performed by the railroad company, the latter thereupon became entitled to a patent from the United States for the land in question, and patent to the land was thereafter issued to the railroad company under date of May 28, 1902.

8. Assuming the facts stated in plaintiff's reply to be true, the rule established by the foregoing decisions compels the conclusion that, in 1881, at the expiration of ten years after the date of the commencement of his adverse possession, plaintiff's grantor became vested with all the title of the Oregon & California Railroad Company as completely and effectually as though the particular lands had been conveyed to him by deed of the railroad company. To all intents and purposes, a sale and conveyance of the land by the railroad company to plaintiff's predecessor was effected.

9. By approval of the report of the railroad company, that it had completed its line of railroad, and the issuance of a patent to the railroad company for the lands within the place limits of the grant, the United States acknowledged that the grantee had fully earned the grant and had performed all of the conditions precedent to its complete operation. It is obvious that thereafter the title of the railroad company to the granted lands, or any of them, could not be taken from the railroad company and returned to the United States, unless the grant reserved to the United States some title or estate paramount to that granted to the railroad company, or contained conditions or covenants, remedies for the

violation of which might operate to reinvest the United States with title. But even so, it is difficult to conceive of a reservation or a breach of covenant or condition, or remedy therefor, that would authorize or empower the United States to reach beyond the railroad company to innocent third persons and defeat and destroy titles vested in them by operation of law or transferred to them by the railroad company pursuant to the express power and direction of the grant and the act of Congress creating it.

10. This brings us to a consideration of the provision of the grant, by virtue of which it is claimed that Congress was enabled to, and did, reinvest the United States with title to the lands in suit. Defendant urges that this result was accomplished by the act of Congress of June 9, 1916 (39 U. S. Stats. at L. 218, Chap. 137), known as the Chamberlain-Ferris Act. The purpose and effect of that legislation will now be considered.

The Chamberlain-Ferris Act was enacted by Congress in response to the decision of the Supreme Court of the United States in the case of *Oregon & Cal. R. Co.* v. *United States,* 238 U. S. 393 (59 L. Ed. 1360, 35 Sup. Ct. Rep. 908). That suit was authorized by a joint resolution of Congress, and was instituted by the United States against the Oregon & California Railroad Company in the United States District Court for the District of Oregon in 1909. The purpose of the suit was to obtain a decree declaring a forfeiture of the lands embraced in the grant which had not been sold by the railroad company, on the ground that the railroad company had violated that provision of the grant sometimes referred to as the "settlers clause," which reads as follows:

"And provided further, that the lands granted by the act aforesaid shall be sold to actual settlers only, in quantities not greater than one-quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre." 16 U. S. Stats. at L. 47.

The United States claimed in that suit that the above-quoted provision of the grant constituted a condition subsequent, upon breach of which the United States was entitled to declare and obtain a forfeiture of the lands, title to which still remained in the railroad company. The breaches alleged all occurred after plaintiff's predecessor acquired title, and consisted principally of sales (all made after 1893) to persons who were not actual settlers on the land, at prices in excess of $2.50 per acre, and in quantities of more than 160 acres to a single person; and the refusal to sell at all after January 1, 1903, notwithstanding that after that date more than 4,000 persons had applied to purchase as many separate tracts of land for the purpose of settling and establishing homes thereon. It affirmatively appeared from the bill that prior to May 12, 1887, nearly 164,000 acres of the land were sold by the Oregon & California Railroad Company, nearly all of which was sold to actual settlers in small quantities within the maximum provided by the act, both as to price and quantity: 28 U. S. 93, 408 (59 L. Ed. 1360, 35 Sup. Ct. Rep. 90, see, also Rose's U. S. Notes).

The railroad company insisted that the proviso was not a condition subsequent, but was a covenant, and unenforceable. Numerous persons who had settled upon the lands, and others who had merely applied to purchase land, were made parties to the suit; the settlers were designated "cross-complain-

ants," and those applying to purchase are referred to in the record as "interveners." The cross-complainants and interveners asserted that the proviso created a trust in favor of them respectively, which trust the court was empowered to enforce, and they asked that receivers or trustees be appointed to administer the grant under the direction of the court.

The District Court rejected the contentions of the railroad company, the cross-complainants and the interveners, and decided in favor of the government, and entered a decree of forfeiture, holding that the proviso was a condition subsequent, and that the railroad company had violated that condition in the respects alleged by the United States.

The suit was appealed to the United States Supreme Court, and there the effect of the proviso was presented in all of its aspects. In that connection the court said:

"It is certain, therefore, that no averment has been omitted from the pleadings; no fact from the testimony that has any bearing on the case; the industry of counsel has neglected no statute or citation, and their ability no comment or reason that can elucidate or persuade."

It is well to note at this point, that the government in that case did not assert or claim, as indeed it could not, that the grant reserved any title or estate in favor of the United States, nor was the presence of such a reservation in the grant claimed by any of the other litigants in the suit. It should also be noted that the purpose of the suit did not extend to any lands, the title to which had passed from the railroad company to third persons. However, the land in controversy in the instant case was described in the bill as unsold lands, for the reason that the

railroad company had not conveyed the same, and the record title appeared to be in the railroad company.

The Supreme Court held that the proviso or settlers clause did not create a trust; that it did not constitute a condition subsequent, but was a covenant, and enforceable, saying:

"Our conclusions then * * are that the provisos are not conditions subsequent; that they are covenants, and enforceable * * .

"There was a complete and absolute grant to the railroad company with power to sell, limited only as prescribed, and we agree with the Government that the company 'might choose the actual settler; might sell for any price not exceeding $2.50 an acre; might sell in quantities of 40, 60, or 100 acres, or any amount not exceeding 160 acres.' And we add, it might choose the time for selling * * ."

It will be observed that the court did not decide that the title or estate of the railroad company was limited, as claimed by defendant, but declared that only its power of sale was limited.

In considering the remedy to be applied for the violation of the covenant by the railroad company, the usual remedies of damages and injunction ordinarily awarded in favor of the covenantee in actions or suits between private parties brought for the enforcement of covenants analogous to the one under consideration, were deemed by the court inadequate, in view of the unusual circumstances and conditions shown by the record. That conclusion was influenced in part by the following considerations: Prior to the grant, the lands were subjected to sale and entry under the public land laws, which laws provided the machinery for their judicious disposition by duly constituted officers of the Land Depart-

ment; when the grant was made, the granted lands were withdrawn from those laws and primarily devoted to another purpose, and were committed to another power to be administered for such purpose under a discretion subject to the restrictions imposed by the granting act; more than 2,000,000 acres of the land remained unsold; when the grant was made, both the railroad company and the United States supposed (and in this they were mutually mistaken) that all the lands were adapted to settlement and ordinary agricultural uses, whereas by far the greater part of the unsold lands was unfit for settlement and agricultural uses, and by reason of the dense growth of timber thereon, invited more to speculation than to settlement; and thus the public interest called for some new arrangement for the disposition of the granted lands, and suitable to the conditions then known to exist, or reasonably discernible in the future.

In view of those considerations, and by reason of the inadequacy of the usual remedies and the inability of the court, by use of its ordinary processes, to provide or give a complete remedy and one suited to the peculiar facts and circumstances of the case, the court indicated that Congress, in the exercise of its sovereign power to legislate, as distinguished from its proprietary powers as a party to the grant, might appropriately provide a special remedy, whereby complete relief might be given and administered in conformity to the court's decision.

Omitting reference to the matters above mentioned, and other matters pertinent to the discussion, the court, pronouncing its judgment and decree, said:

"Rejecting, then, the contention of the Government and the contention of the cross-complainants

and interveners and regarding the settlers clauses as enforceable covenants, what shall be the judgment? A reversal of the decree of the District Court, of course, and clearly an injunction against further violations of the covenants. There certainly should be no repetition of them. What they were the record exhibits. * *

"In view of such disregard of the covenants, and gain of illegal emoluments, and in view of the Government's interest in the exact observance of them, it might seem that restriction upon the future conduct of the railroad company and its various agencies is imperfect relief; but the Government has not asked for more. * *

"However, an injunction simply against future violations of the covenants, or, to put it another way, simply mandatory of their requirements, will not afford the measure of relief to which the facts of the case entitle the Government. * *

"This, then, being the situation resulting from conditions now existing, incident, it may be, to the prolonged disregard of the covenants by the railroad company, the lands invite now more to speculation than to settlement, and we think, therefore, that the railroad company should not only be enjoined from sales in violation of the covenants; but enjoined from any disposition of them whatever or of the timber thereon and from cutting or authorizing the cutting or removal of any of the timber thereon, until Congress shall have a reasonable opportunity to provide by legislation for their disposition in accordance with such policy as it may deem fitting under the circumstances, and *at the same time secure to the defendants all the value the granting acts conferred upon the railroads.*" (Italics ours.)

The court was careful to advise Congress that any remedy provided by it in response to the suggestion of the court must necessarily secure to the railroad company all the value the granting act conferred upon it. The opinion explicitly declared that the proviso

or settlers clause of the grant, when given effect as a law, as well as when considered as a covenant, limited the beneficial interest of the railroad company in the grant to not more than $2.50 an acre for each acre of land granted. The court in its judgment and decree imposed no penalty and assessed no damages; it declared there was no ground of forfeiture, and consequently constitutional inhibitions familiar to everyone prevented both the court and Congress from depriving the railroad company, much less an innocent third person, of any vested beneficial interest in the lands. Lacking authority to provide a remedy that would take from the railroad company anything of value, Congress could not in the act prescribing that remedy incorporate a provision, effective to take from plaintiff his title, and vest it in the United States.

The Chamberlain-Ferris Act recited that it was enacted in execution of the judgment and decree of the court, and following the direction of the court, provided: (1) That title to the unsold lands, except the right of way and similar lands "be and the same is hereby revested in the United States"; (2) For classification of the lands and disposition thereof under the public land laws; (3) For an accounting with the railroad company, and payment to it of the value conferred upon it by the granting act, to wit: $2.50 an acre for each acre of land granted, less the amount received by the railroad company from sales of land or timber or from any other sources relating to said land.

The controversy between the United States and the railroad company again came before the Supreme Court upon an appeal from the decree of the District Court entered upon the mandate from the Supreme Court, and in the opinion in that case the court

considered the Chamberlain-Ferris Act: *Oregon & Cal. R. Co.* v. *United States,* 243 U. S. 549 (61 L. Ed. 890, 37 Sup. Ct. Rep. 443). That the office of the Chamberlain-Ferris Act was to provide a speedy remedy and execute the former judgment of the court was emphasized in the latter opinion. The court said:

"Congress, in the execution of the policy it deemed fitting under the circumstances, as expressed in our opinion, enacted what is called the Chamberlain-Ferris Act of June 9, 1916, Chap. 137, 39 Stat. 218. The validity of the act is challenged and both sides invite a determination of the challenge. The validity of the law may be said not to be involved. * * It, however, may be considered important in the *execution* of the decree, for we have seen that the granting acts were laws as well as grants, had the strength and operation of laws, subject to amendment if the right of amendment existed or accrued. There was a reservation in them of the right of alteration or repeal *and if it could not be exerted to take back what it had granted and had vested,* it could be exerted to accomplish the remedy which the court adjudged to the Government for the violation by the railroad company of the provisions of the grants. [Italics ours.] * *

"The interest that the granting acts conferred upon the railroad company was $2.50 an acre. That secured to it 'all the value the granting acts conferred,' upon it was secured. It is true it had the right of sale, selection of time and settler. If these were rights, they were also aids to the duty of transmitting the lands to settlers; and, the duty having been violated, they became unsuitable to the conditions resulting and obstructions to the relief which had accrued to the Government. In other words, by the conduct of the railroad company the policy of the granting acts had become impracticable of performance and the new conditions—the lands inviting more to speculation than to settlement—demanded other

provision than that prescribed by the granting acts. This was the declaration and direction of our judgment, and the Chamberlain-Ferris Act is the *execution of it.*" (Italics ours.)

11. In that, as in other cases, execution could reach only the interests of the judgment debtor, and was impotent to sequester the title of third parties, especially those not parties to the litigation. 23 C. J. 746.

12. The last section of the granting act provides—

"That Congress may at any time, having due regard for the rights of said California and Oregon Railroad Companies, add to, alter, amend, or repeal this act."

13. Defendant makes the contention that this provision amounted to the retention of a right or interest in the lands, and that it was so held and determined by the Supreme Court in the language above quoted. There is nothing in the language which warrants that construction. The court in effect limited the force of that provision to legislation providing for the future administration of the grant in a manner suitable to the changed conditions, but in subordination to the established rule that authority to alter, amend or repeal, reserved in acts of Congress, is "subject to the limitation that rights actually vested or transactions fully consummated could not be disturbed." *United States* v. *Union Pac. R. Co.,* 160 U. S. 1 (40 L. Ed. 319, 16 Sup. Ct. Rep. 190).

In *Union Pac. R. Co.* v. *United States (Sinking Fund Cases),* 99 U. S. 700 (25 L. Ed. 496), the court considering acts of Congress granting lands to the Union Pacific Railroad, and in which acts the power to alter, amend or repeal was reserved, said:

"The United States cannot, any more than a state, interfere with private rights, except for legitimate

governmental purposes. They are not included within the constitutional prohibition which prevents states from passing laws impairing the obligation of contracts, but, equally with the states, they are prohibited from depriving persons or corporations of property without due process of law. They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. * * That this power has a limit, no one can doubt. All agree that it cannot be used to take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made; * * We think it safe to say, that whatever rules Congress might have prescribed in the original charter for the government of the corporation in the administration of its affairs, it retained the power to establish by amendment. In so doing it cannot undo what has already been done, and it cannot unmake contracts that have already been made, but it may provide for what shall be done in the future, and may direct what preparation shall be made for the due performance of contracts already entered into. It might originally have prohibited the borrowing of money on mortgage, or it might have said that no bonded debt should be created without ample provision by sinking fund to meet it at maturity. Not having done so at first, it cannot now by direct legislation vacate mortgages already made under the powers originally granted, nor release debts already contracted. A prohibition now against contracting debts will not avoid debts already incurred. An amendment making it unlawful to issue bonds payable at a distant day, without at the same time establishing a fund for their ultimate redemption, will not invalidate a bond already out. All such legislation will be confined in its operation to the future.''

The decisions last cited make it plain that the power of amendment reserved in the granting act

related to that legislation considered as a statute and not to its character as a grant, and therefore does not amount to a reservation of title or estate in the lands, and it is equally clear that however regarded, the power should not be effectively exercised to disturb "rights actually vested or transactions fully consummated."

It is apparent from the foregoing review that it was not the purpose, nor within the power of Congress, by the enactment of the Chamberlain-Ferris Act, to divest plaintiff of his complete and perfect title to the land in question, whch had been held and enjoyed by him and his predecessor for more than thirty-five years, and revest the same in the United States.

14. Plaintiff, being vested with complete and absolute title to the land, the assertion by the officers of the Land Department of the United States of jurisdiction over the same, is unauthorized and a nullity, and does not constitute any obstacle to the exercise of the power and authority of the state courts to hear and determine this case.

It follows that the judgment of the Circuit Court should be reversed and the cause remanded, with directions to overrule defendant's demurrer to plaintiff's reply, and for such other and further proceedings not inconsistent with this opinion, as may seem proper, and it is so ordered.

REVERSED AND REMANDED, WITH DIRECTIONS.
REHEARING DENIED. COSTS TAXED.

McBRIDE, C. J., and HARRIS and BROWN, JJ., concur.

BURNETT, J., Dissenting.—In this action of ejectment wherein the plaintiff claims to be the owner in fee simple and entitled to the possession of the land

involved and the defendant claims to be a home-
steader in possession thereof in pursuance of an entry
of the same by him in the United States land office,
this court heard the case and in an opinion by Mr.
Justice BEAN, reported *ante,* p. 299 (214 Pac. 335),
affirmed the judgment of the Circuit Court dismissing
the action after sustaining a demurrer to the plain-
tiff's reply. The principal reason given for the
opinion was that the issue involved the primary
disposition of public land with which the state and
its courts were not privileged to interfere under the
propositions contained in the act of Congress ad-
mitting Oregon into the Union and accepted by the
legislative assembly in the act approved June 3, 1859.
The conclusion of Mr. Justice BEAN's opinion was
that the action should be dismissed without prejudice
to the plaintiff's rights, in effect remitting him to
whatever remedy he might have before the United
States land office. Dissatisfied with this conclusion,
the plaintiff moved for and obtained a rehearing
*in banc.*

Taking the plaintiff at his word, we will examine
the question as if the primary disposition of the
land were not involved. The tract in question is
lot 9 of section 33, township 28 south, range 6 west
of Willamette Meridian, in Douglas County, the same
being an odd-numbered section. By the act of Con-
gress on July 25, 1866, there was granted to the
predecessors in interest of the Oregon and California
Railroad Company for the purpose of aiding in con-
struction of a railroad and telegraph line between
Portland, Oregon, and Marysville, California,

"every alternate section of public land, not mineral,
designated by odd numbers, to the amount of twenty

alternate sections per mile (ten on each side) of said railroad line." 14 U. S. Stats. at L. 239.

The opening clause of that section of the act is:

"That there be, and hereby is, granted to the said companies, their successors and assigns," etc.

Provision was made for filing maps of the survey of the road, for withdrawal from sale of the lands included in the grant, for the protection of pre-emptioners and homesteaders and declaring that other public lands within the limits of the grant should not be sold by the government for less than double the minimum price of public land when sold. No restriction was made as to the price to be charged nor as to the quantity to be sold by the companies if they sold the granted lands or any part thereof. The concluding section 12 of the act is as follows:

"And be it further enacted, That Congress may at any time, having due regard for the rights of said California and Oregon Railroad companies, add to, alter, amend, or repeal this act."

By the act of June 25, 1868, the act was amended so as to extend the time for the completion of the first twenty miles of the railroad and telegraph line to a date eighteen months from the passage of the act and requiring that twenty miles be completed in each two years thereafter and that the whole road should be finished on or before July 1, 1880.

The next legislation affecting the matter was the act of April 10, 1869, whereby any railroad company designated by the legislature of the State of Oregon might file its assent to the act of 1866 one year from the date of the passage of the act of April 10, 1869. The latter enactment concludes thus:

"And provided further, That the lands granted by the act aforesaid shall be sold to actual settlers

only, in quantities not greater than one-quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre.'' 16 U. S. Stats. at L. 47.

The complaint in this action is in the ordinary form employed in our statutory action of ejectment wherein the plaintiff alleges himself to be owner in fee simple and entitled to the immediate possession of the land and that the defendant is in possession thereof wrongly withholding the same to the plaintiff's damage in a sum mentioned. The answer admits the possession of the property to be in the defendant but otherwise traverses the complaint. Further pleading, the defendant states that about May 28, 1902, the United States executed and delivered to the Oregon and California Railroad Company a patent to the land in dispute; that the property remained that of the company subject to the terms and conditions of the laws of Congress hereinbefore recited, until by the act of Congress approved June 9, 1916, 39 U. S. Stats. at L. 218, known as the Chamberlain-Ferris Act, title to the land was reinvested in the United States; that it was afterwards classified as agricultural land and restored to entry under the general provisions of the homestead laws of the United States as modified by that act; that the defendant, as a soldier in the service of the United States in the war with Germany, was given a preferred right of homestead entry by House Joint Resolution No. 20, approved February 14, 1920, in pursuance of all of which on April 13, 1920, he filed his homestead application for the land in the United States land office at Roseburg which said application was duly approved and allowed; and that thereafter on September 19, 1920, under said application and

allowance he took possession of the tract and is now occupying the same.

The reply admits the issuance of the patent, the preference right of the defendant to homestead entry, his application to and allowance thereof by the land office and his entry into possession of the land. The affirmative reply goes into detail averring the passage of the laws of 1866 and 1869 and the doings of the companies in constructing the road, examination thereof and issuance of the patent under date of May 28, 1902. In substance, the reply further avers that in 1878 Robert Phipps, immediate predecessor in interest of the plaintiff, was in the actual, exclusive, notorious, adverse possession of the tract involved, claiming title thereto under a chain of conveyances from his predecessors in interest describing and conveying the tract and extending from the year 1863 down to and including a conveyance of said lot made to Robert Phipps by Samuel Harkness and wife, dated October 23, 1878, under which Robert went into possession of the lot, continued therein, having same under fence, farming and claiming to own the same against all the world, continuously to March 9, 1912, when by deed of that date he placed the plaintiff in possession thereof in which possession the plaintiff remained until September 19, 1920, when the defendant entered upon the same against the plaintiff's will. The defendant demurred to the reply "upon the ground that the matter contained therein is not a sufficient reply to the facts stated in the answer." The demurrer was sustained and the plaintiff declining to plead further, judgment was entered dismissing the action at the cost of the plaintiff, whereupon he appealed.

It is in the history of the case that, authorized and directed thereto by a congressional resolution of April 30, 1908, the Attorney General of the United States began a suit in the District Court of the United States for the District of Oregon against the Oregon and California Railroad Company and others to forfeit the lands of the grant, claiming that the terms of the granting acts constitute conditions subsequent which having been violated by the company in selling the land to persons not actual settlers, in quantities greater than one-quarter section to each person and for a price of more than $2.50 per acre, operated to defeat the title of the railroad company and reinvest it in the government. On appeal to the Supreme Court of the United States from a judgment in favor of the government based upon that theory, that court reversed the decision of the District Court, holding that the provisos are not conditions subsequent but are enforceable covenants. The decree of the Supreme Court provided in substance, however, that the company should be enjoined from selling any more land or the timber thereon or otherwise disposing of same until Congress should take appropriate action looking to the enforcement of the covenants: *Oregon & C. R. R. Co.* v. *United States,* 238 U. S. 393 (59 L. Ed. 1360, 35 Sup. Ct. Rep. 908).

While the suit was pending, Congress passed the act of August 20, 1912, generally known as the Innocent Purchasers' Act, which declared that all the suits begun in pursuance of the joint resolution of April 30, 1908, were ratified and confirmed and declared to be of the same force and effect as declarations of forfeiture of the United States Congress. Section 3 of the act reads thus:

110 Or.—22

"That no suits in equity, actions at law, or other judicial proceedings shall be instituted pursuant to said joint resolution approved April 30, 1908, that shall involve any lands sold by the Oregon and California Railroad Company prior to April 30, 1908, unless the same shall be instituted within one year from the date of the approval of this Act: Provided, That this section shall not be construed to apply to any suits in equity heretofore instituted, nor to any parties thereto, nor to any of the lands involved therein, nor to the institution of any further suits in equity, actions at law, or other judicial proceedings relating to any of the lands that are involved in said pending suits." 37 U. S. Stats. at L. 320.

In Section 4 of the act, authority was given to the Attorney General to compromise suits for the forfeiture of land on the condition that a decree shall be entered adjudging that the lands involved therein have been and are forfeited to the United States, whereupon a purchaser, defendant or defendants, or their successors or assigns, should be entitled within six months after entry of the decree to apply, to purchase all the lands adjudged by said decree to be forfeited at $2.50 per acre, which having been paid, patents should be issued direct to the applicants; but even this privilege was withheld as to the lands not patented to the railroad company and as to all the lands involved in the suit begun as aforesaid, in the United States District Court of Oregon and then pending on appeal, and it is said that the provision of Section 4 should not be construed to apply to any of this land nor to create any rights or privileges whatever in favor of any of the defendants therein. The act concluded with Section 6 reading thus:

"That nothing in this Act contained, nor action taken pursuant to the provisions of this Act, shall be construed as a condonation of any of the breaches

of any of the conditions or provisions annexed to any of the grants designated in said joint resolution approved April 30, 1908, nor as a waiver of any of said conditions or provisions, nor as a waiver of any right of forfeiture in favor of the United States on account of any breach or breaches of any of said conditions, nor as a waiver of any cause of action or remedy of the United States on account of any breach or breaches of any of said conditions or provisions, nor as a waiver of any other rights or remedies existing in favor of the United States.'' 37 U. S. Stats. at L. 321.

The United States Supreme Court decided the suit already mentioned on June 21, 1915. On June 9, 1916, Congress passed an act of that date known as the Chamberlain-Ferris Act, the preamble of which recites: 1. Condition of act of April 19, 1869, requiring sale of land at $2.50 per acre; 2. Violation thereof by Oregon and California Railroad Company by selling greater quantity than one-quarter section to each purchaser at price greater than $2.50 per acre and by refusing to sell at all; 3. The decree of the United States Supreme Court forbidding further sale until Congress should act; 4. Reservation by Congress in the original act of 1866 of right to alter, amend or repeal the act; 5. Receipt by railroad company of money in excess of $2.50 per acre; and 6. Right of the company to receive $2.50 per acre. The enactment proceeds as follows:

"That the title to so much of the lands granted by the acts [reciting legislation already mentioned] for which patents have been issued by the United States or for which the grantee is entitled to receive patents under said grants * * as had not been sold by the Oregon and California Railroad Company prior to July 1, 1913, be and the same is hereby revested in the United States * * .''

Section 2 classifies lands thus forfeited into, 1. Power sites; 2. Timber lands; 3. Agricultural lands. By Section 7 the Attorney General was directed to institute and prosecute any and all suits and actions at law against the railroad company and any other proper party which he may deem appropriate to determine the amount of money received by the company from or on account of said granted lands, patented or unpatented, sold or unsold, which should be charged against the "full value" secured to the grantees.

The plain effect of the joint resolution of Congress directing the Attorney General to institute proceedings, coupled with the decision of the United States Supreme Court in *Oregon & California R. R. Co.* v. *United States,* 238 U. S. 393 (59 L. Ed. 1360, 35 Sup. Ct. Rep. 908), and the Innocent Purchasers Act (so called) of August 20, 1912, and the Chamberlain-Ferris Act of June 9, 1916, is that the government was committed to the policy of avenging the violation of the granting acts, whether they be in the shape of conditions subsequent or merely covenants held enforceable according to the decision of the United States Supreme Court in the effort to enforce the terms of the act by judicial proceeding as upon condition subsequent. In passing the Chamberlain-Ferris Act the government took advantage of the decree suspending sales of the lands until Congress should adopt appropriate legislation looking to the enforcement of the covenants. That enforcement was not necessarily to be by judicial action. In the beginning Congress had reserved, by Section 12 of the original act of July 25, 1866, the power to alter, amend or repeal the act at any time, having due regard for the rights of the company. Equipped

with this reserve power, Congress assuredly had the right to take away entirely all title to the land. This reservation was part of the grant. As stated, it was a legislative remedy cumulative upon whatever judicial remedy might exist for the enforcement, either of a condition subsequent or a covenant. Congress had exercised that power of changing the act in two separate instances, namely, in the act of June 25, 1868, extending the time of the completion of the road and the act of April 10, 1869, prescribing for the first time the maximum price of $2.50 per acre for which the company could sell the land.

The reply amounts only to a claim of title even against the government, by adverse possession for a period of ten years. The plaintiff claims benefit under the Innocent Purchasers Act. It will be remembered that the inhibition of the Innocent Purchasers Act against suits to be instituted pursuant to the joint resolution approved April 30, 1908, applied only to lands "sold" by the Oregon and California Railroad Company prior to April 30, 1908; and further, that the section should not apply to any suits in equity theretofore instituted, nor to any of the parties thereto, nor to any of the lands involved therein, nor to the institution of any further suits in equity, actions at law, or other judicial proceedings relating to any of the lands involved in any such pending suits. The reply does not disclose that the land here in question was not involved in such a suit. Unless it was not included in pending suits it would not come within the restriction against suits for forfeiture unless commenced within a year. The intent of the act as disclosed by its terms was not to interfere in any way with pending litigation. Neither can it be said that the reply indicates at all

that the Oregon and California Railroad Company had "sold" the land. All that is claimed by that pleading is that in 1863, the predecessors in title of the plaintiff began an adverse possession which had been maintained continuously since then to the entry of the defendant upon the tract. It is true that at common law, according to Blackstone, title to land is held either by descent or purchase, the former being an estate cast upon the tenant by operation of law resulting from the death of an ancestor, the latter dependent upon some act of the tenant. This generalization has been criticised by other common-law writers such as Coke, Hargrave and Chitty: 2 Bl. Com., Lewis' Ed., 202, note.

So far as the sale or purchase is involved in the acts of Congress under consideration, the meaning evidently is that there should be a contract between the railroad company and a purchaser involving a conveyance of the land by the company for a consideration, either paid or promised by the purchaser. Indications to that effect abound throughout the legislation. For instance, in Section 7 of the Chamberlain-Ferris Act, the Attorney General is required to institute suits against any party, including the railroad company, to determine the amount of money received by the company which should be applied and charged against the full value secured to the company. It is not likely that such a law would have been passed if the intention had been that "sale" should include the passing of title by adverse possession. In fact, the legislation recognizes the right of the company to receive $2.50 per acre and requiring it to account for all of the money received; but money is not involved in the acquisition of title by prescription.

The Innocent Purchasers Act of August 20, 1912, in Section 6 already quoted, declares with great particularity that the enactment shall not be construed to be a waiver of any of the rights of the United States. For two reasons, therefore, the plaintiff cannot claim any benefit under that act: First, because it does not appear in the reply that the land was not included in the suit against the railroad to declare the forfeiture as upon condition subsequent; and second, it was not land that had been "sold" by the Oregon and California Railroad Company, there being no act whatever of the railroad company stated which would indicate that it had sold the land or made any other disposition of it. It is true that the original grant of 1866 was *in praesenti* and whatever title passed inured to the grantee at least when the line of the railroad was located and approved by the government officials. But what was that title? It was one subject to be defeated at the congressional will by altering, amending or repealing the original granting act as reserved in the terms thereof. Whoever took title through the railroad company, whether by direct bargain and sale or by adverse possession, took it subject to that condition. It was part and parcel of the essence of the title and Congress had the legislative right to enforce it. No possession of any individual, however adverse, to the railroad company could have the effect of destroying this right reserved by the general government in its legislation. To hold otherwise would be to say that mere occupancy of public land without entering it at the local land office, which is the case made in the reply on behalf of the plaintiff, would defeat a subsequent grant to the railroad company; yet it is held in *Northern Pacific R. R. Co.* v. *Colburn,* 164 U. S. 383 (41 L. Ed.

479, 17 Sup. Ct. Rep. 98), cited by the plaintiff, that such an occupancy without an entry at the local land office does not exclude the land from the appropriation of a subsequent railway grant. In *St. Paul R. R. Co. v. Northern Pacific R. R. Co.,* 139 U. S. 1 (35 ˚L. Ed. 77, 11 Sup. Ct. Rep. 389), the grant to the latter company was *in praesenti* in the nature of a float until the route should be determined and after that, attaching to specific sections capable of identification. The court held thus, as stated in the syllabus:

"After the withdrawal from sale or pre-emption of the granted odd sections, no interest in the granted lands, adverse to the rights of the company, could be acquired except by special legislative declaration nor indeed in the absence of its announcement, after the general route was fixed."

So far as adverse possession of government land is concerned, the rule as stated in *Sharpe* v. *Catron,* 67 Or. 368 (136 Pac. 20), derived from *Boe* v. *Arnold,* 54 Or. 52 (102 Pac. 290, 20 Ann. Cas. 533), is that:

"One claiming title to land by adverse possession for a period of ten years as against all persons, but recognizing the superior title of the United States government, and seeking in good faith to acquire that title, may assert such adverse possession as against any person claiming to be the owner under a prior grant."

That precept applies only to private persons as between themselves but not to the United States. In other words, for illustration, suppose there are two homesteaders, A and B, each recognizing and seeking to acquire the title of the government to the same tract. Although A is prior in making claim to the land, yet if B succeeds in maintaining his possession for the statutory period of ten years, he will be allowed to prevail over A, but not against the

government in the enforcement of its reserved power over the land. Here the plaintiff makes no pretension of seeking in good faith to acquire the title of the government. He has not made application to any land office or other government authority so far as his pleading discloses. Reduced to its lowest terms, he claims only to have occupied as against the railroad company. Granting that he has done so, he does not get a better title than the company had. His estate cannot arise above its source. His possession cannot defeat or abrogate the rights of the government. The law has prevented him from acquiring the government title. He cannot acquire it in any other way. If the railroad company had a defeasible title, he acquired nothing greater or better by his adverse occupancy. It is true that it is said in some cases that title by adverse occupancy includes the whole title; but while this is true as between individuals, it cannot be true as against the government which holds the allodial tenure. In *Deseret Land Co.* v. *Tarpey,* 142 U. S. 241 (35 L. Ed. 999, 12 Sup. Ct. Rep. 158), the plaintiff claimed by occupancy of the land within a railroad grant as against the defendant who was the lessee of the railroad company. The court held:

"The lands could not be disposed of by the company without the consent of Congress, except as each twenty-mile section of the road was completed and accepted by the President, so as to cut off the right of the United States to compel the application of the lands to the purposes for which they were granted or to prevent their forfeiture in case of the company's failure to perform the conditions of the grant."

Great reliance is placed by the plaintiff on the case of *Northern Pacific R. R. Co.* v. *Ely,* 197 U. S. 1 (49

L. Ed. 639, 25 Sup. Ct. Rep. 302). In that case, the United States had granted to the company a right of way across the public lands four hundred feet in width. The defendants had occupied portions of that right of way for more than ten years, succeeding which Congress passed the act of April 28, 1904, validating all conveyances made by the company or its predecessor, involving the right of way, with the proviso that no such conveyance should have the effect to diminish the right of way to less than two hundred feet on each side of the center of the main track. The company had complied with all the requirements of the granting act. The court held that but for the curative act of April 28, 1904, no title would accrue to any occupant by virtue of his adverse possession. True enough it was held likewise that inasmuch as the laws of the State of Washington as embodied in the decision of the court were to the effect that adverse possession transferred title as effectually as conveyances of the owner, the adverse possession of the defendants in the suit was tantamount to a conveyance and that as the curative act was remedial in its nature, its effect would be extended to support the title of occupancy. The case differs in material particulars from the one in hand. The issue there joined was between the railroad company and the occupant direct. Here, in effect, it is between the plaintiff and the general government under whom the defendant claims. There the company had complied with all the laws embodied in the granting acts. Here, violation of the grant is written large throughout the record and those violations have been adjudicated as breaches of a covenant. That they had been broken is declared by the legislation contained in the Chamberlain-Ferris Act and the Innocent Purchasers

Act. There the act of April 28, 1904, waived the claim of the government and expressly validated conveyances. Here, in the Innocent Purchasers Act especially, the government has expressly declared that there should be no waiver of any claim of the United States.

Again, the adverse possession relied upon here was adverse only against the railroad company and not against the government. No act of the plaintiff can defeat the rights of the government except in pursuance of its laws authorizing the acquisition of the public domain. The governing principle is that so long as the government retains its hold upon the title to the land, no adverse possession can affect or lessen that hold. It is hornbook law that no one can acquire title against the United States by adverse possession. It is true that a patent was issued to the railroad company for the lands in dispute. At least it is so averred in the reply and this must be taken as true as against the demurrer; but the issuance of patent, an act of a ministerial officer, cannot confer a greater title than that authorized by the original granting act. All persons dealing with the land are charged with notice of the provisions of the law constituting the grant. The resulting doctrine is that the government is entitled to enforce the conditions of the grant by the means reserved in that grant as against all those who claim under mere adverse possession. As stated in *Northern Pacific Ry. Co.* v. *Townsend,* 190 U. S. 267, 271 (47 L. Ed. 1044, 23 Sup. Ct. Rep. 671):

"In effect the grant was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted. This being the nature of the title to the land granted for the special

purpose named, it is evident that to give such efficacy to a statute of limitations of a State as would operate to confer a permanent right of possession to any portion thereof upon an individual for his private use, would be to allow that to be done by indirection which could not be done directly.''

See *Kindred* v. *Union Pacific R. R. Co.*, 225 U. S. 582 (56 L. Ed. 1216, 32 Sup. Ct. Rep. 780); *Union Pacific R. R. Co.* v. *Snow*, 231 U. S. 204 (58 L. Ed. 184, 34 Sup. Ct. Rep. 104).

To sanction the reply would be to say that at the mere behest of a  private party the general government can be deprived of its right to enforce by legislative enactment the power reserved in the granting act of 1866. The proposition is not to be countenanced. The government cannot be balked in the assertion of its rights reserved in the original granting act.

Compelled by the rule in ejectment to recover, if at all, on the strength of its own title, the plaintiff's reply fails to connect him with the paramount estate in the land, that of the United States. He is not within the rule in *Sharpe* v. *Catron, supra,* in that he does not recognize the superior title of the United States and does not show that he is seeking in good faith to acquire that title. The defendant conforms to that precept in both particulars according to the answer. Although his complaint avers title in fee simple, in his reply which the general demurrer has attacked, the plaintiff ·utterly fails to corroborate his initial pleading. Treating the issue as he presents it, it should be adjudged against him and the decision of the Circuit Court affirmed.

Bean and Rand, JJ., concur.