# OREGON & CALIFORNIA RAILROAD COMPANY ET AL. *v.* UNITED STATES.

## ON CERTIFICATE FROM AND CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 492. Argued March 8, 9, 1917.—Decided April 23, 1917.

The Oregon-California Railroad Grants (Acts of July 25, 1866, as amended, and May 4, 1870) made no distinction between land covered with timber and other land, nor between the timber or other incidents and the land itself; title to all was vested in the railroad company for transmission to actual settlers upon the terms prescribed by the acts. The substantial interest granted the company was the right to exact not more than $2.50 per acre in so disposing of the lands. *Oregon & California R. R. Co.* v. *United States,* 238 U. S. 393, discussed and followed.

While the railroad company could use the lands as a basis of credit, it could not by trust deed convey an interest in either land or timber exempt from the obligations imposed by the granting acts or the power of the Government to compel their performance.

The granting acts being not mere instruments of conveyance but laws reserving the right of alteration or repeal, Congress, to overcome a situation largely due to breaches of obligation by the railroad company which made the original scheme impracticable, had power without the company's consent to resume the title and provide for disposition of the land by the Government under conditions assuring the company the equivalent of its interest in the grants—not more than $2.50 per acre.

The "Chamberlain-Ferris Act" of June 9, 1916, c. 137, 39 Stat. 218, examined and found to accord with the power of Congress and the principles laid down by this court in *Oregon & California R. R. Co.* v. *United States,* 238 U. S. 393.

The former decision of this court having directed an injunction to hold the land and timber intact until Congress should have reasonable opportunity to make new provisions for disposing of them consistently with the interest of the railroad company, and an act having been passed accordingly after entry of the decree in the District Court, this court, upon a review of the decree based on an alleged

departure from its former mandate, may properly determine the validity of the act as a matter involved in the decree's execution.

Under Rule 24, costs in this court are not allowable in cases where the United States is a party.

Where the United States obtained a decree declaring railroad land grants forfeited for breaches of obligation by the railroad company and upon appeal the decree was reversed because the obligations broken were not conditions subsequent but statutory covenants and relief against the company by injunction was decreed accordingly, costs of the litigation in the District Court were properly awarded by that court to the United States.

THE case is stated in the opinion.

*Mr. P. F. Dunne,* with whom *Mr. Wm. F. Herrin, Mr. Wm. D. Fenton* and *Mr. Frank C. Cleary* were on the brief, for the Oregon & California Railroad Company *et al.*

*Mr. Perry D. Trafford* for the Union Trust Company of New York.

*Mr. Constantine J. Smyth,* Special Assistant to the Attorney General, with whom *The Solicitor General* was on the brief, for the United States.

*Mr. Francis J. Heney,* by leave of court, filed a brief as *amicus curiæ.*

MR. JUSTICE MCKENNA delivered the opinion of the court.

This is the second appearance of the case in this court. It is on certificate from and certiorari to the Circuit Court of Appeals for the Ninth Circuit, to which court it was taken by appeal to review a decree of the District Court for the District of Oregon entered in fulfillment of the mandate of this court.

The decree of the District Court was reversed and the

present controversy is as to what our mandate required. As expressing their different views of it the Government and the railroad company—we shall so refer to the defendants, except where a distinction is necessary—submitted forms of decrees to the District Court. The court adopted the decree submitted by the Government, and that action is assigned as error.

The case as made in this court on its first appearance is reported in 238 U. S. 393–438, and contains all of the elements for the decision of the questions now presented. Before detailing those elements we may say preliminarily that the difference between the decree entered and that proposed by the railroad company was in the extent of the restraint upon the company in the disposition of lands granted in aid of the construction of certain railroads and telegraph lines. The acts making the grants contained the provision that the lands granted should be sold to actual settlers only, in quantities not greater than one-quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents an acre.

The decree restrained the railroad company from selling "to any person not an actual settler on *the land* sold to him," with limitation of quantity and price stated, "and from selling any of the timber on said lands, or any mineral or other deposits therein, except as a part of and in conjunction with the land on which the timber stands or in which the mineral or other deposits are found; and from cutting or removing or authorizing the cutting or removal of any of the timber thereon; or from removing or authorizing the removal of mineral or other deposits therein, except in connection with the sale of the land bearing the timber or containing the mineral or other deposits."

The decree as proposed by the railroad company omitted the injunction against selling the timber and mineral deposits.

Upon these differences in the proposed and entered decree the railroad company bases its contention that the latter is not in accordance with the mandate of this court, and in support of it it has presented elaborate arguments to establish a distinction between *lands* and the timber on them and the mineral deposits in them, and that the command of the acts of Congress to sell the lands did not include the timber or deposits. In other words, it is contended that the acts of Congress gave the railroad company "the right of an owner by absolute grant to the use of the timber on his land" and to avail himself of the minerals therein; and that, therefore, the restraint that the District Court put upon the railroad company was in excess of the mandate. "It was what this court has termed an 'intermeddling' with matters outside of the scope of the mandate. It proceeded to determine that the railroad had no right to use the timber upon its own lands while they were still unsold and in its possession and occupancy; it determined that the railroad company could not even make a clearing in anticipation of a sale to some settler, or dig out a ton of coal; and it adjudged that the owner of the land had no right in the timber or the coal except to pass it, as part of the realty, when it sold the land to a settler at $2.50 an acre."

The complaint is graphic. Its attempted justification is the assertion of a grant in absolute ownership. Such ownership is the foundation of the railroad company's contention and on this foundation it builds its argument and upon the insistence that the lands having been granted, necessarily as incidents to them the timber and minerals on and within them were granted. An immediate and sufficient answer to the contention would seem to be that the grant was not absolute but was qualified by a condition in favor of settlers and that if the "lands" granted had such incidents the "lands" directed to be sold to actual settlers were intended to have such incidents. That is,

if the "lands" granted carried by necessary implication all that was above the surface and all below the surface to the railroad company, they carried such implication to the actual settler. In other words, what "lands" meant to the railroad company they meant to the settler, embraced within his right to purchase and acquire. We are not disposed, however, to rest upon this summary answer but will consider with more particularity our mandate.

It is not necessary to trace the title of the lands to the railroad company. It is sufficient to say that the source of the title was an Act of Congress approved July 25, 1866, c. 242, 14 Stat. 239, as amended by the Acts approved June 25, 1868, c. 80, 15 Stat. 80; April 10, 1869, c. 27, 16 Stat. 47; and May 4, 1870, c. 69, 16 Stat. 94, which acts granted lands to aid in the construction of certain railroads and telegraph lines. The Act of 1869 contained this proviso: "*And provided further*, That the lands granted by the act aforesaid [Act of 1866] shall be sold to actual settlers only, in quantities not greater than one-quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre." There was a like provision in the Act of 1870.

The Government brought suit against the railroad company, alleging that these provisos constituted conditions subsequent, charging breaches of the conditions by the company and praying for a forfeiture of the unsold lands.

The railroad company denied that the provisos were to be so construed and alleged that they constituted restrictive and unenforceable covenants and set up other defenses.

The District Court adopted the view of the Government as to the provisos and entered a decree forfeiting the lands and the case came here for review.

The contentions of the Government and the railroad company were repeated in this court, and it was, besides,

contended that the provisos only applied to lands susceptible of actual settlement and cultivation and did not include timber lands.[1]

We rejected the contention of the Government; we rejected in part the contention of the railroad company, saying: "Our conclusions, then, on the contentions of the Government and the railroad company are that the provisos are not conditions subsequent; that they are covenants, and enforceable."

But how enforceable? And what was the remedy for breaches?—and breaches there were, many, gross and determined. It was certainly not intended to be decided that these breaches, with all of their consequences, were to be put out of view and the railroad company only enjoined against future breaches. Yet this, in effect, is the contention, and it is attempted to be supported by certain language in the opinion. Before quoting it we may say in general that much that is cited from it must be considered in reference to the controversies which were presented, and that the granting acts and their provisos were necessarily construed as of the time of their passage. Action under them and the breaches of them came afterwards, and a consideration of the remedies to which the Government was entitled. Keeping this comment in mind we can more easily understand the language of the opinion in description of the grant and in regard to the relief that was awarded the Government.

As to the grant this was said—and it is much insisted on—"There was a complete and absolute grant to the railroad company with power to sell, limited only as pre-

---

[1] There were cross-complainants and interveners, the first asserting that the provisos created trusts in favor of actual settlers, and the second that the trust had the scope of including all persons who desired to make actual settlements upon the lands. The decree of the District Court and the decision here were adverse to both contentions and this case has no further concern with them or with those who made them.

scribed, and we agree with the Government that the company 'might choose the actual settler; might sell for any price not exceeding $2.50 an acre; might sell in quantities of 40, 60, or 100 acres, or any amount not exceeding 160 acres.'" And we added, "it might choose the time for selling or its use of the grants as a means of credit, subject ultimately to the restrictions imposed; and we say 'restrictions imposed' to reject the contention of the railroad company that an implication of the power to mortgage the lands carried a right to sell on foreclosure divested of the obligations of the provisos."

This declares the meaning of the words of the acts taken by themselves. It points out the power of the railroad company and that it was "limited only as prescribed." It does not point out the remedy of the Government if the limit prescribed was transcended. For that we must look to other parts of the opinion. We took pains to declare that the principles of the case were "not in great compass," that circumstances had given "perplexity and prolixity to discussion," but had not confused the simple words of the acts of Congress regarded either as grants or as laws, and that they were both, and, as both, they conferred rights quite definite and imposed obligations as much so—the first having the means of acquisition; the second, of performance. And we gave emphasis to them as laws and the necessity of obedience to them as such, the remission of their obligation to be obtained "through appeal to Congress" and not by an evasion of them or a defiance of them.

The evasions and defiance we showed, and the extent to which they transcended the policy and purpose of the Government expressed in the covenants. We contrasted the requirement of the grants of a sale to an actual settler of 160 acres (maximum amount) with sales of 1,000, 2,000, 20,000 and 45,000 acres to single purchasers, and the use of the lands for homes with their use for immediate

or speculative enterprises. The relief the Government was entitled to, we said, was not satisfied by preserving its rights to the lands sold and we further said that "an injunction simply against future violations of the covenants, or, to put it another way, simply mandatory of their requirements, will not afford the measure of relief to which the facts of the case entitle the Government."

· The reason was expressed. The Government alleged, to show a disregard of the covenants, that more than 1,000 persons had applied to purchase lands from the railroad company in conformity with the covenants. The company, replying, said the applications were not made in good faith for settlement, but for speculation, the lands being valuable only for their timber and not being fit for settlement, and further alleged that at no time had the lands fit for actual settlement exceeded 300,000 acres, in widely separated tracts, and had been sold during the construction of the road and prior to its completion to actual settlers in the prescribed quantities and at the prescribed price.

We have seen that other sales were made in quantities in excess of that prescribed by the statute, and not for settlement, at prices from $5.00 to $40.00 an acre, and that at the time the answer was filed there remained unsold over two million acres, the reasonable value of which was $30,000,000. There was no intimation that the lands did not include the timber and it was not only recognized but asserted that the lands were more valuable for the timber than for settlement.

Our judgment took care of the situation. It preserved the remedies of the Government for past violations of the granting acts and recognized that new dispositions were necessary to secure the rights that had accrued to the Government. We said that owing to the "conditions now existing, incident, it may be, to the prolonged disregard of the covenants by the railroad company, the lands ·

invite now more to speculation than to settlement, and we think, therefore, that the railroad company should not only be enjoined from sales in violation of the covenants, but enjoined from any disposition of them whatever *or of the timber thereon and from cutting or authorizing the cutting or removal of any of the timber thereon,* until Congress shall have a reasonable opportunity to provide by legislation for their disposition in accordance with such policy as it may deem fitting under the circumstances and at the same time secure to the defendants all the value the granting acts conferred upon the railroads."

The design of this and its adequacy would seem to need no comment. It was intended to be a guide to the District Court—indeed, a direction of the decree of the court. The decree complied with the direction. See *Southern Oregon Co.* v. *United States* (Circuit Court of Appeals, Ninth Circuit, decided February 13, 1917).

Congress, in the execution of the policy it deemed fitting under the circumstances, as expressed in our opinion, enacted what is called the Chamberlain-Ferris Act of June 9, 1916, c. 137, 39 Stat. 218.[1] The validity of the

---

[1] The provisions of the act, so far as they affect the railroad, may be summarized as follows:

It recites, among other things, that this court had ordered that the railroad company be enjoined from "making further sales of lands in violation of the law," and further enjoined from "making any sales whatever of either the lands or the timber thereon until Congress should have a reasonable opportunity to provide for the disposition of said lands," etc., and enacts that the title to so much of the lands as had not been sold by the railroad prior to July 1, 1913, be and the same is hereby revested in the United States, excepting right of way and lands in actual use by the railroad for depots, side-tracks, etc. (§ 1). The lands shall be divided into three classes: power sites, timber lands, and agricultural lands (§ 2). The timber shall be sold by the Secretary of the Interior at such times and in such manner as may seem best, and the lands from which it is removed shall thereafter be classed as agricultural lands (§ 4). The lands classed as agricultural shall be sub-

act is challenged and both sides invite a determination
of the challenge. The validity of the law may be said not
to be involved. The appeal is from the decree, and, that
being determined to be right, the appeal, it may be urged,
is satisfied, the questions it presents decided. It, however,
may be considered important in the execution of the de-
cree, for we have seen that the granting acts were laws as
well as grants, had the strength and operation of laws,

---

ject to entry under the homestead laws but patents shall not issue until
the lands have been cultivated for three years (§ 5). The Attorney
General is authorized to institute proceedings against the railroad com-
pany and others to have determined the amount of moneys already
received by the railroad company or its predecessors on account of sales,
etc., of the granted lands and which should be charged against it as
part of the "full value" secured to the grantees under the granting
acts as heretofore interpreted by this court. In making such determi-
nation the court shall take into consideration all moneys received from
sales of lands or timber, forfeited contracts, rent, timber depredations
and interest on contracts, or from any source relating to the lands, and
also the value of the timber from the lands and used by the grantees or
their successors. In such suits the court shall also determine the
amount of taxes on the lands paid by the United States as provided in
§ 9 of the act and which should have been paid by the railroad, and
the amounts thus determined shall be treated as money received by
the railroad company (§ 7). The title to all moneys arising out of the
granted lands and now on deposit to await the final outcome of the
suit commenced by the United States in pursuance of the joint resolu-
tion of April 30, 1908, is hereby vested in the United States and the
United States is subrogated to all the rights and remedies of the obligee
or obligees under any contract for the purchase of timber on the grant
lands (§ 8). Provision is made for the payment by the United States
of accrued taxes on the lands revested by the act (§ 9). The proceeds
of the timber and the lands shall be deposited in the Treasury of the
United States and be paid to the railroad or the lien holders as the
fund accumulates, and at the end of ten years an appropriation shall
be made from the general funds of the Treasury of the United States
to pay any balance which may be due to the railroad (§ 10). The profits
derived from the transaction shall be paid one-quarter to the State of
Oregon and one-quarter to the counties where the lands are situated,
while one-half shall be retained by the Government (§ 10).

subject to amendment if the right of amendment existed or accrued. There was a reservation in them of the right of alteration or repeal and if it could not be exerted to take back what had been granted and had vested, it could be exerted to accomplish the remedy which the court adjudged to the Government for the violation by the railroad company of the provisions of the grants. It is no answer to the exertion of the power and remedy to say that the acts of Congress were initially complete and absolute grants. It is to be borne in mind that they carried with them covenants to be performed and necessarily an obligation to perform them, with remedies for breaches of performance. Such was our judgment, as we have seen, and the judgment was adapted to the conditions created by the breaches, and for this legislation was deemed necessary.

But the railroad company says that the legislation directed was to have its consent and that such consent "was essential to a valid resumption or alteration of its vested rights," and that this was what this court meant when it said "that any legislation in the premises by Congress should 'secure to the defendants all the value the granting acts conferred upon the railroads.'"

We have already answered the contentions. The railroad company, by pushing into view the rights conferred by the granting acts and putting out of view the wrongs committed by it, can easily build an argument upon and invoke the inviolability of vested rights; and to say that its consent was necessary to legislation is to say that it could dictate the remedy for its wrongs, preclude or embarrass the policy of the Government.

The interest that the granting acts conferred upon the railroad company was $2.50 an acre. That secured to it, "all the value the granting acts conferred" upon it was secured. It is true it had the right of sale, selection of time and settler. If these were rights, they were also aids

to the duty of transmitting the lands to settlers; and, the duty having been violated, they became unsuitable to the conditions resulting and obstructions to the relief which had accrued to the Government. In other words, by the conduct of the railroad company the policy of the granting acts had become impracticable of performance and the new conditions—the lands inviting more to speculation than to settlement—demanded other provision than that prescribed by the granting acts. This was the declaration and direction of our judgment, and the Chamberlain-Ferris Act is the execution of it.

The Union Trust Company was one of the defendants in the suit and is one of the parties here. It was heard by its own counsel at the bar and through brief. In the main its argument is the same as that of the railroad company, varied somewhat in detail, and asserts that it has not only the rights of the railroad but, "in *addition* and *especially*, that even if it is possible for the Government now to take away rights once conveyed to the railroad, *it cannot take them except subject to the lien of the mortgage.*"

So far as the rights of the trust company coincide with those of the railroad company we have considered them, and they cannot be greater than those of that company. The railroad company, it is true, could use the lands as a basis of credit, but only to the extent of its interest in them, subject to the performance of its obligations and the power of the Government to exact their performance.

We were careful to observe this subordination. We expressed the extent of the interest that the railroad company received and that "it might choose the time for selling or its use of the grants as a means of credit," but, we also said, "subject ultimately to the restrictions imposed." And, further, we said "'restrictions imposed' to reject the contention that an implication of the power to mortgage the lands carried a right to sell on foreclosure divested of the obligations of the provisos."

The case was responded to as it was presented and no phase of it was omitted in presentation or response that could influence its judgment. Of what was in the minds of counsel, determining and urging their contentions, of what was in the mind of the court in response to the contentions, the opinion leaves no doubt, and that after the fullest consideration of all that was involved of rights and remedies the judgment was pronounced.

A distinction is now attempted to be made between a sale of the lands and the use of the lands, including in the use of them the right to cut the timber upon them and extract minerals (coal and iron) from them. Such use, it is asserted, is a necessary incident of ownership and that such use was not intended to be taken away nor could it have been taken away by our judgment.

To answer the contentions would be mere repetition of what we have said. The distinction now made between the lands and their use is but the contention urged on the first appeal and rejected—that the provisos only applied to lands susceptible of actual settlement and not to timber lands. The distinction then was between the lands, now between their constituting elements, and for the same reason: to give to the railroad company and the trust company what the granting acts did not give, or, rather, gave for the purpose of transmission to actual settlers. This transmission becoming impracticable, other disposition of the lands, including all that is signified by the word, was adjudged.

The trust company also attacks the Chamberlain-Ferris Act and is assisted in the attack by a "friend of the court." The attacks have the same basis as that which we have noticed—that is, the rights of the railroad company are asserted to be vested and inviolable. The contention gets a semblance of strength from the ability of counsel. To yield to it would be in effect to declare that covenants violated are the same as covenants performed—

wrongs done the same as rights exercised—and, by confounding these essential distinctions,. give to the transgression of the law what its observance is alone entitled to.

The decree of the District Court taxed costs against the railroad company, and this is assigned as error. The amount is stated to be $6,249.02. So far as this sum includes costs on the former appeal we think there was error. The railroad company was compelled to appeal from the decree against it. The decree was reversed and no costs were awarded for or against it, and could not have been under Rule 24 of this court. The rule gives costs to the prevailing party in certain cases. The provision, however, does not "apply to cases where the United States are a party; but in such cases no costs shall be allowed in this court for or against the United States." Our mandate was in accordance with the rule and the decree should not have awarded costs to the United States. To that extent it is erroneous and should be modified by deducting the costs which were incurred in this court; and, so modified, it is

*Affirmed.*

MR. JUSTICE McREYNOLDS took no part in the consideration and decision of this case.