Joseph L. MILLER, Jr., et al., Plaintiffs,

v.

Wright MALLERY et al., Defendants.

Civ. No. 73–609.

United States District Court, D. Oregon.

March 5, 1976.

Charles J. Merten, Portland, Or., for plaintiffs.

Jack G. Collins, Portland, Or., for federal defendants.

## OPINION

BURNS, District Judge.

Plaintiffs filed this class action to challenge Forest Service practices in the Bull Run Watershed area. Five claims were made: 1) breach of the public trust; 2) Bull Run Trespass Act, 18 U.S.C. § 1862; 3) Organic Act, 16 U.S.C. § 476; 4) National Environmental Policy Act, 42 U.S.C. § 4321; 5) Multiple-Use Sustained-Yield Act, 16 U.S.C. § 528. Jurisdiction is claimed under 28 U.S.C. §§ 1331, 1337, 1361, and 5 U.S.C. §§ 701–706.

Having determined that the action should be maintained as a class action and having provided for appropriate notice to the class, I segregated the second claim for separate trial. Rule 42 F.R. Civ.P. All counsel agreed that the issues involved were relatively narrow and that resolution of this claim could, if plaintiffs prevailed, make unnecessary further proceedings on the other claims. Plaintiffs' second claim is that the logging program of the Forest Service, both inside and outside the watershed, and the recreation permitted in a section of the Reserve outside the watershed, are impermissible in light of the Trespass Act, 18 U.S.C. § 1862. After trial in January, 1975, extensive briefs were filed by plaintiffs and by federal defendants, as well as some of the other defendants. Later, I requested additional briefing on certain aspects, including the principle of administrative construction. These briefs were supplemented by oral argument in late October, 1975. The work by counsel—particularly the briefs submitted—has been outstanding, exemplifying the highest professional standards of performance. I am grateful to them, and express this note of appreciation.

## I. THE BULL RUN RESERVE AND WATERSHED:

Water for the City of Portland comes from the Bull Run watershed, a physically defined area of 67,329 acres that lies almost entirely within the 142,080 acres of the legally defined Bull Run Reserve.

(See the appended map.) The Reserve is roughly triangular, about sixteen miles on a side, and lies on the west side of the Cascade Range along the Bull Run River east of Portland and slightly northwest of Mt. Hood.

By proclamation of June 17, 1892, 27 Stat. 1027, President Benjamin Harrison exercised the authority given him in § 24 of the Act of March 3, 1891, 26 Stat. 1095, to "[reserve] from entry or settlement and set apart as a public reservation" the lands now known as the Bull Run Reserve. Other lands were combined with the Reserve, Executive Order (EO) 864, June 30, 1908, and the whole was named the Oregon National Forest. That name was changed to Mt. Hood National Forest in 1924, EO 3944, January 21, 1924.

Administered originally by the Department of the Interior, the Reserve has since 1905 been administered by the Forest Service in the Department of Agriculture. 33 Stat. 628 (1905). The federal defendants are officials of the Forest Service. Mallery is Supervisor of the Mt. Hood National Forest. Stockbridge is District Ranger of the Columbia Gorge Ranger District; Olsen of the Zig Zag Ranger District; and Mueller of the Hood River Ranger District. Schlapfer is the Regional Forester of the Pacific Northwest Region (Region Six). The private defendants are corporations or individuals with contract purchaser rights under outstanding unexecuted timber-sale contracts with the United States for timber in the Reserve. In addition, I permitted intervention by Clackamas County. Rule 24 F.R.Civ.P.

A small part of the watershed is not within the Reserve. Removed from the Reserve by proclamation of June 30, 1911, 37 Stat. 1704, this part passed into private ownership but has since been reacquired by the United States and is now a part of the Mt. Hood National Forest. Within the watershed, approximately 3,980 acres are owned by the City of Portland and approximately 780 by Defendant Publishers Paper. About 4,000 acres within the Reserve had been granted to the Oregon & California Railroad Company; two years after the O & C lands were revested in the United States, 39 Stat. 221 (1916), those within the Reserve were reserved and set aside as part of the Oregon National Forest, 40 Stat. 1015 (1918).

Logging apparently began in the Reserve in 1935 with a small blowdown logging operation, on city owned land, involving about 40 acres. From then, until 1955, it was desultory, and apparently limited to a very few selective, blowdown and other salvage type operations. The years from 1954 to 1958 showed some increase, while since 1958, large-scale ongoing commercialized sustained-yield logging has increased tremendously. Since 1958, a total of 870,000,000 board feet have been cut—579,000,000 inside the watershed and 291,000,000 inside the Reserve but outside of the watershed.[1] Nearly three hundred miles of roads have been constructed. On June 30, 1974, 72 timber sales were active in the Reserve and additional sales were planned for the future (Statement of Agreed Facts, filed January 22, 1975).

The statute involved in this claim refers to "the reserve known as Bull Run National Forest." 18 U.S.C. § 1862. Defendants Champion International and Louisiana Pacific have argued that "there is no such place." That description appeared in the 1909 codification and was carried over in 1948. Whether or not an indictment in that language would be sustainable, I am satisfied the description is adequate for the civil purposes of this lawsuit. It is not unconstitutionally vague, *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), nor was any express intent to change the substance indicated. *Fourco*

1. See federal defendants' answers to plaintiffs' Interrogatories Nos. 10, 15, Set 1. See also Portland City Club Report (1973) (Plaintiffs' Ex. 34).

*Glass Co. v. Transmirra Corp.,* 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957). The "Bull Run National Forest" of § 1862 is the land described in the Presidential proclamation of 1892, 27 Stat. 1027, less the piece removed in 1911, 37 Stat. 1704.

## II. THE BULL RUN TRESPASS ACT:

The statute forming the basis for plaintiffs' second claim was enacted in 1904 as An Act For the Protection of the Bull Run Forest Reserve and the sources of the water supply of the City of Portland, State of Oregon, ch. 1774, 33 Stat. 526. The text was:

"That from and after the date of the passage of this Act it shall be unlawful for any person or persons, except forest rangers and other persons employed by the United States to protect the forest, and Federal and State officers in the discharge of their duties, and the employees of the water board of the city of Portland, State of Oregon, to enter, for the purpose of grazing stock, [or for any purpose whatsoever,] upon any part of the reserve known as the Bull Run Forest Reserve, in the Cascade Mountains, in the State of Oregon, which reserve was established by proclamation of the President of the United States in eighteen hundred and ninety-two, as provided by section twenty-four of an Act of Congress entitled 'An Act to repeal timber-culture laws, and for other purposes,' approved March third, eighteen hundred and ninety-one, and which reserve includes within its area the water supply of the city of Portland, State of Oregon; and any person or persons, save those hereinbefore excepted, who shall engage in grazing stock, or who shall permit stock of any kind to graze within said Bull Run Forest Reserve, or who shall [enter upon said forest reserve, or be found therein or in any part thereof] *knowingly trespass* thereon, shall be deemed guilty of a misdemeanor, and on conviction thereof in the district court of the United States for the district of Oregon shall be fined not to exceed five hundred dollars, in the discretion of the court. And the Secretary of the Interior is hereby authorized and directed to enforce the provisions of this Act by all proper means at his command, and to exclude from said forest reserve stock of all kinds and all persons, save as hereinbefore excepted." (Material in brackets deleted, and material emphasized added by amendment.)

As adopted, the Act incorporates two amendments, one from the Senate and one from the House. Apparently concerned about the harshness of a criminal penalty (a $500 fine) for innocent wandering onto the Reserve, Senator Pettus suggested that "or for any purpose whatsoever" be stricken after the phrase "for the purpose of grazing stock." The amendment was agreed to. 38th Cong. Rec. 3028 (1904). On the House side, the Committee on Public Lands recommended that "enter upon said forest reserve, or be found therein or in any part thereof" be replaced by the more concise and somewhat less strict "knowingly trespass." That amendment was also agreed to, 38th Cong. Rec. 5250 (1904).

In the 1909 codification of statutes, the 1904 Act appeared this way:

"Whoever, except forest rangers and other persons employed by the United States to protect the forest, federal, and state officers in the discharge of their duties, and the employees of the water board of the city of Portland, State of Oregon, shall knowingly trespass upon any part of the reserve known as Bull Run National Forest, in the Cascade Mountains, in the State of Oregon, or shall enter thereon for the purpose of grazing stock, or shall engage in grazing stock thereon, or shall permit stock of any kind to graze thereon, shall be fined not more than five hundred dollars, or imprisoned not more than six months, or both." 35 Stat. 1099.

Congress had, however, affirmatively expressed an intention not to change the

meaning of the Act except in minor, specified ways:

"While the language of the Act revised in this section has been transposed and the redundant matter omitted, the only change made in the section consists in the addition of imprisonment as part of the punishment, or both. The last sentence of the act directing the Secretary of the Interior to enforce its provisions is unnecessary, as such authority is conferred in general acts applying to all reservations." S.Rep.No.10, Part I, 60th Cong., 1st Sess. (1908).

The general act referred to is 16 U.S.C. § 472, enacted in 1905, ch. 288 § 1, 33 Stat. 628, which makes the Secretary of Agriculture responsible for enforcement of all laws affecting reserved public lands.

When the criminal code was revised in 1948, "changes were made in phraseology and arrangement, but without change of substance." H.Rep.No.304, 80th Cong., 1st Sess. The law in its present form reads:

"Whoever knowingly trespasses upon any part of the reserve known as Bull Run National Forest, in the Cascade Mountains, in the State of Oregon, or unlawfully enters thereon for the purpose of grazing stock, or engages in grazing stock thereon, or permits stock of any kind to graze thereon, shall be fined not more than $500 or imprisoned not more than six months, or both.

"This section shall not apply to forest rangers, and other persons employed by the United States to protect the forest, or to Federal and State officers and employees of the water board of the City of Portland, State of Oregon, in the discharge of their duties." 18 U.S.C. § 1862.

One change did warrant a Reviser's Note. "The phrase 'or enters thereon for the purpose of grazing stock' etc., was qualified by the adjective 'unlawfully' to make it clear that grazing permit holders are exempted." 18 U.S.C. § 1862. Perhaps if the Reviser had been as well briefed on the history of the Act as counsel have made me, he would share my view that a change allowing grazing by permit was more than a clarification. Fortunately, I need not decide that. The Forest Service has not permitted grazing of any kind in the Reserve. In addition, for reasons discussed below, the propriety of activities other than grazing, i.e., logging and recreation, is controlled by other considerations than simply the grazing provisions of § 1862.

## III. DO PLAINTIFFS HAVE A REMEDY UNDER THE ACT?

The Bull Run Trespass Act is a criminal statute, whose enforcement is normally entrusted to the Attorney General and the United States Attorney. Defendants argue various propositions:

a) Courts won't enjoin commission of a crime;

b) Criminal statutes are enforceable only by prosecutorial authorities; and

c) The Trespass Act imposes no duties on the federal defendants enforceable by means of a civil lawsuit such as the one brought here by plaintiffs.

Although the first two propositions are generally true—courts won't enjoin crimes, *U. S. v. Jalas,* 409 F.2d 358 (7 Cir. 1969), and criminal statutes are usually grist only for the prosecutor's mill—the truth of the first two generalizations does not necessarily confer validity upon defendants' third assertion. Case law developed over the last 60 years calls defendants' third assertion severely into question.

Beginning in 1916 with *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 and leading up to *Cort v. Ash,* decided last year, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court has established and refined the principle that under certain conditions the law will imply a civil remedy, either by way of injunctive or damage relief, or both, for redress of harm to a

class, or a member thereof, whose protection was the object of a particular criminal statute. Cases along the way which illuminate the development of this doctrine and which serve to stake out its contours include *J. I. Case v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964); *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).[2] In *Cort v. Ash,* the Supreme Court spelled out the four factors which are relevant in making the determination whether "a private remedy is implicit in a [criminal] statute not expressly providing one." This section discusses those four factors.

■ The *first* factor is whether the plaintiffs are "one of the class for whose especial benefit the statute was enacted . . . that is, does the statute create a federal right in favor of plaintiff?" Here the plaintiffs include all resident water users of the City of Portland. In light of the thorough statutory history of the Bull Run Trespass Act as developed by the briefs and as summarized above, I have little difficulty in concluding that plaintiffs are precisely the class, indeed, the identical class, for "whose especial benefit" the Trespass Act was passed. Section 1862 was not passed for resident water users in Wagontire, Oregon, or Chicago, Illinois. It was passed especially for the benefit of resident water users of the City of Portland.

The *second* factor specified by *Cort* is whether there is any explicit or implicit legislative intent creating or denying civil remedies. I find that the most accurate thing to be said here is that the Congress was silent with respect to its intent. (Since Rigsby, the originator of the doctrine of implication of a private civil remedy under a criminal statute,

came nearly 12 years after the trespass statute was originally enacted in 1904, it is perhaps not surprising that Congress said nothing one way or another about whether it did or did not intend implication of a remedy.) Consequently, this factor must weigh neutrally.

Passing for the moment the third factor, the *fourth* factor in *Cort v. Ash* is whether or not the cause of action sought to be implied by plaintiff is one "traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." Here, except for the private defendants who were brought in as a result of the application of Rule 19, F.R.Civ.P., the cause of action is essentially against those federal officials who are charged with the duty of protection of the Bull Run Reserve. Plaintiffs' second claim poses a basic challenge to the manner in which Bull Run timber and "recreation" resources have been administered by federal defendants—officials of the Forest Service. Federal statutes essentially preclude scrutiny by a state court of federal official action. 28 U.S.C. § 1442. Plaintiffs' second claim can hardly be said, therefore, to be the type of cause of action "traditionally relegated" to state law. Here the conduct at the heart of plaintiffs' second claim is a federally authorized and supervised commercialized, sustained-yield large-scale timber operation on federal lands. Efficiency of local or state trespass statutes or remedies is not to be expected in these circumstances. This large-scale operation has been both authorized and promoted during the past 15 or 20 years by the Forest Service, which has radically changed in the past generation from a preservation to a production agency. That this transformation has not escaped judicial attention is shown by the recent Fourth Circuit decision in *Isaac Walton*

---

**2.** Indeed, in *Wyandotte Transportation Co. v. U. S.,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), the Court extended the applicability of this doctrine to the government itself, based upon the inadequacies of the criminal

sanctions to insure "the full effectiveness of the statute which Congress had intended." 389 U.S. at 202, 88 S.Ct. at 386, 19 L.Ed.2d at 415. Involved there was the Rivers & Harbors Act of 1899, 33 U.S.C. § 401 et seq.

*League v. Butz*, 522 F.2d 945, at 954–5 (August 21, 1975).

Left for consideration is the *third* factor mentioned by *Cort v. Ash*, perhaps the key factor in plaintiffs' second claim. Is it consistent with the underlying purposes of the legislative scheme to imply a civil remedy, given the provisions of the criminal statute involved? In part, this involves what Judge Learned Hand captured in a single striking phrase when he spoke of statutory interpretation as involving a "proliferation of purpose." Here the remedy sought by plaintiffs' class is one which would test the legality of actions by the very officials themselves who are charged with the duty of preventing harm to Bull Run water by "trespass." But here those very officials have authorized—indeed welcomed—the alleged "trespass," namely, commercial, large-scale, ongoing logging operations. And their legal adviser—the U. S. attorney—is the one whose duty is the prosecution of violations of criminal statutes, including the Bull Run Trespass Act. Failure to imply a civil remedy for the benefit of the protected class, where the alleged law breaker is also the law enforcer, would frustrate, not promote, the purpose of the Act.

Three of the four factors mentioned in *Cort v. Ash* militate in favor of the implication of a civil remedy while only one—the legislative record—factor is essentially neutral.

I conclude, therefore, that:

a) Plaintiffs are those for whom the statute was passed;

b) Plaintiffs' cause of action is not traditionally relegated to state law, making inappropriate the inference of a federal law remedy; and

c) Denial of civil remedy permitting plaintiffs to challenge the application of the statute would be inconsistent with the underlying legislative scheme.

Therefore, a remedy, consistent with the legislative purpose, should be, and is, granted and fashioned.

Further support for this result may be found in a recent Ninth Circuit case, *Stewart v. Travelers Corp.*, 503 F.2d 108 (1974). The *Stewart* court said that implication of private civil remedies depends in part on evaluating the adequacies of the express remedies of the statute. In turn, this question depends upon

" . . . whether those express remedies ensure the full effectiveness of the congressional purpose underlying the statute. In this sense, when the statute in question seeks to protect an individual's interest, it is not enough for it to have some enforcement mechanisms: the initial question is whether the statute's protection might be enhanced by allowing private civil relief." 503 F.2d at 112.

Since neither the Trespass Act nor the general statutes concerning enforcement of laws relating to reserved lands provide "contrary implications," *see Reitmeister v. Reitmeister*, 162 F.2d 691, 694 (2 Cir. 1947), it would be unwise to assume that exclusively criminal or governmental enforcement was intended. *See also Burke v. Compania Mexicana De Aviacion, S.A.*, 433 F.2d 1031 at 1033 (9 Cir. 1970).

Certain of the defendants have relied substantially on the *Bass Angler* cases, particularly *Bass Angler Sportsman Society v. U. S. Steel Corp.*, 324 F.Supp. 412 (N.D.Ala.1971), aff'd 447 F.2d 1304.[3] These cases are inapposite because by contrast the regulatory scheme provided in 33 U.S.C. § 413 specified that the Department of Justice "shall conduct the legal proceedings necessary . . . "

Denying enforcement to plaintiffs by means of an implied civil remedy would under these circumstances eviscerate the Trespass Act. The federal defendants have stoutly insisted that in their view the challenged practices are proper.

---

**3.** Also mentioned are *Bass Angler Sportsman Society v. U. S. Plywood*, 324 F.Supp. 302 (S.D.Tex.1971), and *Bass Angler Sportsman*

*Society v. Scholze Tannery, Inc.*, 329 F.Supp. 339 (E.D.Tenn.1971).

They are here defended by the U. S. Attorney, the official charged with the duty of prosecuting violations of the statute. Thus nonenforcement of the statute insofar as it makes necessary an evaluation of large-scale, commercialized logging is not only apparent but is real. I believe the answer therefore to be that the law must and does imply an available civil remedy for the plaintiffs.

## IV. JURISDICTION:

Plaintiffs claim jurisdiction under four separate headings: federal question, 28 U.S.C. § 1331; commerce clause, 28 U.S.C. § 1337; mandamus, 28 U.S.C. § 1361; and Administrative Procedure Act (A.P.A.), 5 U.S.C. § 701 et seq.

Bottoming jurisdiction on the A.P.A. is a hazardous enterprise indeed. The Ninth Circuit, as recently as November 5, 1975, in what may be dictum, speaks of "our most recent view" as being "that the A.P.A., like the Declaratory Judgment Act, 28 U.S.C. § 2201, does not independently confer jurisdiction on the district court." *Nguyen Da Yen, et al. v. Kissinger, et al.,* 528 F.2d 1194 (Nos. 75–2493, 2632). But on January 23, 1976, the same Court (though a different panel) in what seems not to be dictum at all, stated flatly of the district courts' jurisdiction that "Jurisdiction for judicial review of the agency action lies under 5 U.S.C. §§ 701–706." *Arnold et al. v. Morton, et al.,* 529 F.2d 1101, 1103 n.2 (9th Cir. 1976). *See also Proietti v. Levi,* (No. 74–1399) 530 F.2d 836 (1976).

 There is a suggestion in earlier Ninth Circuit cases, mentioned on p. 1201 of 528 F.2d of the *Nguyen* opinion, that 5 U.S.C. § 701 may confer jurisdiction, at least where the plaintiff has sought, as far as possible under available agency procedures, to obtain through the administrative agency the relief now sought from the court. Here, in light of the steadfast position asserted by the federal defendants, any resort to the agency would obviously have been una-

vailing. To the extent that I am permitted, by applicable Ninth Circuit precedent, I would, and do hold that A.P.A. jurisdiction exists.

 In any event, jurisdiction exists under § 1331, the federal question statute. While defendants denied this jurisdictional underpinning, this contention was not strenuously argued. It is apparent from the evidence that the necessary jurisdictional amount exists. The amount in controversy is measured by determining the value of the right asserted by the plaintiffs. So long as I cannot say to "a legal certainty" that the value of the matter in controversy is less than the jurisdictional amount, jurisdiction must be found to exist. *Kimball v. Callahan,* 493 F.2d 564 (9 Cir. 1974). Here, the right which plaintiffs seek to vindicate is the right to have a continuing supply of clean water for the City of Portland. To say that this right is not of greater value than $10,000 would be to make a mockery of the claim asserted.[4] Thus it becomes unnecessary for me also to rely upon §§ 1337 and 1361 for jurisdiction, though I am inclined to think that the mandamus statute might also confer jurisdiction. Once construction of the duties imposed by statute is settled, the federal defendants would have a clear duty to obey the statute as thus construed. The fact that implementation of it might pose difficult factual problems later on, would not necessarily defeat mandamus jurisdiction. *Roberts v. U. S.,* 176 U.S. 221, 20 S.Ct. 376, 44 L.Ed. 443 (1900); *Carey v. Local Board,* 297 F.Supp. 252 (D.Conn.1969); aff'd, 412 F.2d 71 (2 Cir. 1969).

## V. WHAT DUTY DOES THE ACT CREATE?

This question lies at the heart of plaintiffs' second claim. Federal defendants manage the Bull Run Reserve as they manage other national forest land, paying appropriate due under multiple-use rules to Bull Run's special value as a

---

**4.** Though the *Nguyen* opinion (528 F.2d p. 1201, n.10) casts some uncertainty about the value, for jurisdictional amount purposes, of

an intangible right, this, I take it, is even more in the nature of dictum than the statement made about the A.P.A.

watershed. Their duty, they argue, is defined by the Organic Act, 16 U.S.C. § 473 et seq., and the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528–531. The Forest Service "permits" loggers to enter for logging operations authorized by these Acts. Hence, the Service reasons, such loggers are not trespassers. They cannot be because a trespasser is one who enters without permission. Loggers have a right to enter because they have permission. Plaintiffs contend, in essence, that Bull Run is *different*: the statute creates a special duty with respect to the Reserve, superseding general national forest duties.

On its face, the Trespass Act provides an incomplete answer to our question. If, as defendants argue, persons without permission are the Act's only subjects, then to whom may the Forest Service give permission? If stock grazing is so carefully forbidden, was that the sole harm to which the Act was directed? If multiple-use and sustained-yield duties were imposed in 1960, what effect should be given to rights and duties granted and defined by the apparently conflicting 1904 statute? These constituent questions and the central question of the duty created have answers in the origin, history, and purpose of the Reserve and the Trespass Act.

When President Harrison set aside the Bull Run Reserve, he did so in response to a request from the water board of the City of Portland, "in order that its proposed water supply might be protected." S.Rep.No.1358, 58th Cong., 2d Sess. 1 (1904). Twelve years of investment in and experience with the Reserve taught the water board that

" . . . there is not a habitation, field, or road on the watershed of the river above the point where the water for the city is taken out, and its *isolation and inaccessibility* are its best safeguards, and there is nothing which can pollute the water or lessen its flow unless grazing is permitted or the forest is destroyed by fire; and

" . . . grazing would tend to destroy the undergrowth and pollute the water, and the presence of hunters, fishermen, *or other persons* would, during the dry seasons, greatly increase the danger of forest fires." (Emphasis supplied.) (S.Rep. p. 2.)

With these concerns in mind, the water board asked the state's Congressional delegation to introduce legislation that would prohibit grazing on the Reserve and

" . . . exclude therefrom all persons except the rangers and other persons employed by the United States to protect the forest, Federal and state officers in discharge of duty, and the employees of the water board."

Two dangers then were critical: pollution from animals, and fires from humans. Two protections were asked: no grazing, and no entry. As the text above in Part II shows, the adopted legislation focused on those dangers and those protections. On the Senate side, the Committee on Forest Reservations and the Protection of Game found "the reasons for the proposed legislation" in the water board's resolution quoted above. From the Committee on Public Lands in the House came a report reprinting the Senate report and adding that:

"The provisions of this bill look toward a better protection of this small area of mountainous country than now exists from the danger of forest fires caused by summer camping parties, grazers of stock, *and other sources of danger and damage.* H.Rep.No.2579, 58th Cong., 2d Sess. (1904) (emphasis supplied).

To be sure, defendants are correct that logging is nowhere mentioned in the statute or the legislative history. No logging was going on in the Reserve at the time. None was apparently contemplated. Thus the water board had no reason to name that specific activity as one to be forbidden in pursuit of its purposes to protect against fire and pollution. But if the purposes are clear, and if the challenged activities fall within the prohibitions adopted to achieve those

purposes, then failure to enumerate the challenged activities should create no exception. Thus, if fire and pollution avoidance are the purposes, and if large-scale logging requires entry, if entry has been forbidden, then lack of an explicit prohibition against such logging is not the equivalent of a grant of permission for that sort of logging.

Some light is shed on the special position of the Bull Run Reserve by disposition of the "O and C" lands revested in the United States in accordance with the decision in *Oregon & California Ry. Co. v. U. S.*, 243 U.S. 549, 37 S.Ct. 443, 61 L.Ed. 890 (1916), and the Act of June 9, 1916, 39 Stat. 218. The railway had owned some sections within the reserve boundaries, but not subject to public control. Upon revesting, the question was whether to add those sections to the Reserve or to permit their disposal along with other O & C lands. Shortly before expiration of the two-year waiting period for Bull Run provided in the revesting act, Congress permanently set aside the O & C sections as part of the Reserve. Ch. 192, 40 Stat. 1015 (1918).

Asked to comment on that proposal, the Secretary of Agriculture indicated his interpretation of the Trespass Act:

> "This Act . . . prohibited the use of the land by any person, forbade the grazing of live stock, and provided that a penalty be imposed upon all persons who entered this land *other than those specifically designated to administer* the area. (Emphasis added.)

No provision for timber sales was made in the reservation.

By contrast, in several nearly contemporaneous reservations of O & C lands

for watershed purposes, Congress specifically authorized the Secretary of Agriculture to dispose of timber on the reserved lands when he found that timber could be cut without danger to the water supply. Ch. 69, § 2, 41 Stat. 405 (1920). Similar authority was given in additions of O & C lands to the Siskiyou National Forest, 42 Stat. 1019 (1922), and the Rogue River National Forest, ch. 494, 49 Stat. 1460 (1936). The latter addition was requested by the City of Ashland to protect its watershed, but Congress specifically provided that the lands were "subject to all the laws and regulations governing the national forests," ch. 494, 49 Stat. 1460 (1936), including the timber sale provisions of the Organic Act.

This history[5] lends support to a conclusion that both Congress and the responsible agency, the Department of Agriculture, believed throughout this period that the Bull Run Trespass Act limited the Department's general authority over national forests. "Use of the land *by any person*," (emphasis added) was forbidden. Only "those specifically designated to administer the area" were free from penalty.

Defendants' argument that persons with permission cannot be trespassers so that their entry raises no issue under the Trespass Act is not well taken. First, it begs the question of the propriety of permission. Second, the phrase "knowingly trespass" was substituted for language that would have punished persons entering or being found in the Reserve. The substitution tempered the original's strict liability; it did not open a gate through which loggers of the Reserve could flood. Hence, in this section, I attempt to define the boundaries of propriety.

---

5. This history, also, is sufficient to refute defendants' claim that administrative construction of § 1862 compels denial of relief to plaintiffs here, a subject concerning which I requested additional briefing and re-argument. (See p. 2 of this Opinion.) But the administrative construction in which defendants depend has only occurred since about 1958, though defendants say that their program is based on a 1943 legal opinion (federal defendants' answer to plaintiffs' Interrogatory No. 13, Set 1).

But administrative interpretation is only "one input in the interpretation equation." *Zuber v. Allen*, 396 U.S. 169, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345, 360 (1969). And we are instructed that the "deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia . . ." *American Shipbuilding Co. v. N.L.R.B.*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855, 867 (1965). *Hodgson v. Consolidated Freightways*, 503 F.2d 797 (9 Cir. 1974).

The bedrock of defendants' position is that when Congress devised, in the Multiple-Use Sustained-Yield Act, a system for managing the national forests it intended that system to override whatever duties were created by the Trespass Act. I do not agree, "for it is familiar law that a specific statute controls over a general one 'without regard to priority of enactment.' *Townsend v. Little*, 109 U.S. 504, 512, [3 S.Ct. 357, 362, 27 L.Ed. 1012, 1015] (1833)." *Bulova Watch Co. v. U. S.*, 365 U.S. 753, 758, 81 S.Ct. 864, 868, 6 L.Ed.2d 72, 76 (1961). Had Congress intended, when it adopted the Multiple-Use Sustained-Yield Act, to abandon the special protections for Bull Run, it could have done so explicitly. It may do so in the future. However, without such action by Congress, I must conclude that the specific duties of the Trespass Act take precedence.

The duty, to summarize, is a duty to exclude from the Bull Run Reserve all persons except

: : Federal and State officers and employees of the water board of the City of Portland in the discharge of their duties[6], and

: : forest rangers and other persons employed by the United States affirmatively to protect the forest.

It is not enough to exclude those whose presence may be found to do no harm to the forest. The statute's presumption is that *no one* should disturb Bull Run. Only an affirmative purpose to protect and a showing of capacity to do so can overcome that presumption.

## VI. DO LOGGING AND RECREATION PROTECT THE FOREST?

Since 1959, recreation has been permitted in a part of the Reserve (42,-000 acres) not within the watershed. The recreational area was defined by an order of the Regional Forester dated August 12, 1959 (Govt. Ex. 13). In light of the specific attention given by the water board and the Congress to the dangers of recreation, I conclude that the Regional Forester's order was without authority in law. Hunters, fishermen, and campers were a source of danger vividly in the minds of those who asked for and wrote the Trespass Act. It cannot be seriously contended that such persons, who now enter the Reserve freely under the 1959 order, are protecting the forest. Indeed, the defendants do not seriously so contend. Their position vis-a-vis recreation, as set forth in answer to Interrogatory No. 4 (Set 2), is based solely on their view of the Multiple-Use Sustained-Yield Act, not on any contention that recreation "protects" the water supply. (See White Depo. pp. 22–24.)

They do contend, however, that logging is "designed for the protection of the forest and the watershed." (Fed. Defts' reply brief, p. 10.) (Ans. to Int. No. 3, Set 2.) Most of the evidence presented at trial dealt with this issue. From the testimony and the depositions[7] a picture emerges of the dangers from which a forest must be protected. The most important are: landslides, blowdown, insects, disease, and fire. What does logging contribute to protection from each of these?

To protection from landslides, logging contributes nothing. (White Depo. p. 25.)

The major danger posed by blowdown, insects, and disease is the secondary effect they have in creating fire danger. (White Depo. p. 38.) Neither the Forest Service nor any of us can, of course, prevent the windstorms that cause blow-

---

6. Dams and other parts of the waterworks have been, and may in the future be, constructed by independent contractors hired by the water bureau. Such persons come within this exception, as employees in the discharge of their duties. Substantial dam and conduit construction has occurred over the years, largely by the City of Portland, acting through private contractors. The details are found at p. 5, Statement of Agreed Facts.

7. John Wilson, fire staff officer on the Mt. Hood National Forest; John White, planning coordinator for the Bull Run Planning Unit; David Graham, director of the Forest Insect and Disease Control Group (Forest Service Pacific Northwest Region).

downs, but the amount of damage done to the trees can be affected in two ways: by the general health of the stand and by its exposure to the wind. Weak trees fall more easily, and trees along the edges of open spaces are prime candidates for blowdown. What this suggests is that a highly selective logging program, or its equivalent, may be useful in minimizing the occurrence of effects of blowdown by removing individual weak trees, but that clearcutting,[8] which leaves large bare spaces, contributes to the problem by sharply increasing the number of exposed edges in the forest.

Insect threats to the forest come mostly from the Douglas Fir Bark Beetle. (The Balsam Wooly Aphid also causes some damage, though limited to true firs and particular elevations.) (Graham Depo. p. 18.) The bark beetle is endemic to the forest, but reaches epidemic and seriously damaging levels only as a result of major blowdowns. Down trees are less resistant to attack than healthy ones. The hospitable environment they provide makes possible breeding of enough beetles to create a danger to healthy trees in the year after initial attack. Forest Service policy is to control beetle outbreaks by prompt removal of blowdowns, as was recommended by Mr. Graham's office after the big January 1973 blowdown. The trees must be removed before the annual breeding cycle is completed. Whether or not the policy is practiced, logging for this purpose is protective of the forest. As Mr. Graham indicated, however, a sustained-yield program "would probably not be necessary if timber production and timber growing were not one of the uses in the area." (Graham Depo. p. 30.) Such a program is not necessarily protective of the forest, although selective and expeditious cutting and removal of blowdowns is.

Poria Root Rot is a fungus disease that attacks trees in the Bull Run. Removal of trees, stumps, and roots is one control method, but

". . . this is not a real practical or economical control method because of the large expense involved. And so we plant other less susceptible conifer species in those openings." (Graham Depo. p. 24.)

"We only recommend that corrective and preventative actions be taken if the area with the root disease happens to fall within an area that is being harvested." (Graham Depo. p. 26.)

Protection from Poria Root Rot is, thus, incidental to, rather than the purpose of, logging in Bull Run.

We turn finally to fire, the great and dramatic danger to Bull Run. The Forest Service argues that logging protects the forest in two ways, by reducing fuel levels and by enabling the construction of a road system for ready access to fires. See especially federal defendants' answer to plaintiffs' Interrogatory No. 3, Set 2. Plaintiffs contend that logging increases fire danger.

Danger to a forest from fire has two components: risk and hazard. Risk is the likelihood that a fire will be started. Hazard is the potential for damage by a fire, a function of rate of spread and resistance to control. Logging cannot be said to reduce the risk of fire: it cannot affect the incidence of lightning and it raises rather than lowers the risk of man-caused fires. Clearly, "the man-caused risk is higher than lightning right now," (Wilson Depo. p. 38) as shown by statistics from 1960 to 1973 in the Bull Run. Fifteen watershed fires (totalling 1,472 acres) were caused by man, only seven by nature (encompassing only 7 acres).[9]

---

8. The "clearcutting" issue, as such, is the subject of other claims asserted by plaintiffs. Nothing here is intended to intimate any opinion on that untried issue.

9. Indeed, the statistics furnished in the federal defendants' answers to plaintiffs' Interrogato-

ries (Set 1, No. 11; No. 12) are perhaps even more revealing. From 1900 through 1959, there were eight man-caused fires (totaling 5014 acres) and 27 nature caused (totaling 8424 acres).

As to fires which occurred in an area encompassing a ten mile strip beyond the Bull

Logging may, however, have an effect on fire hazard. Mr. Wilson, Fire Staff Officer on the Mt. Hood National Forest, indicates that the service's aim is to reduce fuel loading through proper fuel management, all to avoid a catastrophic fire that could severely damage Bull Run. That aim and that means to its achievement are apparently sensible, modern forestry practices, but I do not · believe that discursive conclusions about theories of fire protection are necessary for decision in this case. What is important here is to decide whether the large-scale, commercialized, sustained-yield logging program presently carried on by the Forest Service in fact reduces the hazard of fire. The uncomplicated truth is that slash from logging is not removed, the present program annually *increases* rather than decreases the fuel load, and does so in the types of fuel that are most dangerous as precursors to a crown fire.

> "Many of the most damaging fires in the region start or spread in slash areas. This applies particularly to the Douglas Fir region on the West side of Oregon and Washington where clearcutting produces volumes of residue ranging from 40 to 227 tons/acre." *Environmental Effects of Forest Residues Management in the Pacific Northwest*, p. A–5 [hereafter "PNW–24"]

Figures for the Bull Run Reserve are somewhat higher, as is suggested by inference from the federal defendants' figures, averaging 200 tons/acre generally and 300 tons/acre in old growth. (Federal defendants' answers to plaintiffs' Interrogatory Nos. 8, 10, Set 2.) These compare with a ground fuel level in undisturbed old growth Douglas Fir of about 30 tons/acre. And while the de-

fendants' answers suggest that the 200/300 ton figures relate to the amount actually burned, other evidence suggests that only one-half of the slash is actually burned. (PNW–24 pp. A–6–12.) My own impression was fortified by the view taken in this case in November. And it might be different if all of the slash were promptly burned. Slash from old growth forests "nearly always results in an extreme rate of spread and resistance to control. The potential for disastrous fires is high in the latter case unless the slash is disposed of immediately." *Slash Disposal Information Sheet*, p. 1, USFS. (Pltf. Memo Ex. 1.[10])

Unfortunately, "logging residue is not being abated—it is accumulating." PNW–24, p. A–11. In the years 1970 to 1973, 8676 acres were logged in the Bull Run; only 3991 acres of slash were burned. Within the watershed, 5225 acres were logged; only 1259 acres of slash were burned. Federal defendants' answers to plaintiffs' Interrogatory No. 10(d), (e), Set 1. Even the slash-burned acres may have high ground fuel levels because slash burning does not remove all the fuel. The sustained-yield commercial logging program conducted in Bull Run adds to rather than decreases the fuel levels: to say that large-scale commercial logging increases, rather than diminishes, protection of the forest from fires is to say that black is white.

The Forest Service has built nearly three hundred miles of roads in the Reserve, increasing the mobility of fire fighters and decreasing the response time for fires. So extensive a road system could not have been built without the revenue from timber sales. (Govt. Ex. 7, p. 6; Govt. Ex. 2, p. 3.)

---

Run (except for Washington State), from 1958 to 1973 there were 729 fires, 82% caused by man and 18% by nature.

**10.** "The presence of dead residue in amount and distribution that precludes effective protection from fire constitutes *the greatest threat* to forests and their management. This situa-

tion occurs primarily in the form of slash from the clearcut logging of old growth timber, which often leaves 50 to 100 or more tons of flammable debris per acre. *Fuel of this magnitude*, especially in high risk areas, *constitutes a critical protection problem*." (Emphasis added.) (PNW–24, p. A–12.)

Indeed, the evidence at trial was strong, from the government's own witnesses as well as from the government's answers to plaintiffs' interrogatories, that the road system which has been constructed since 1958 has not been the system which would have been built if intended primarily for fire fighting and control purposes. The road system largely represents roads to timber—not roads to fires. This, of course, reflects the dilemma and reality which the Forest Service faces—not only in the Bull Run, but elsewhere, as well. It can't get enough dollars from Congress to build the roads it would like (for purposes apart from logging), so it does the best it can. It "piggybacks" fire roads onto the back of logging roads, because it can get the logging roads built by timber purchasers. That is precisely what happened in the Bull Run. The roads were primarily for logging, and only incidentally for fires.

Under the Forest Service's theory, to protect the water and the forest, it has to build roads to fight fires; it has to sell timber—lots of it—to get the roads built. Ergo, large-scale timber sales protect the forest. This may or may not be good logic, given the pitfalls of the federal budget process. But my duty is not to evaluate the logic, but rather to evaluate the law. Good logic or not, I hold this theory is not good law, in light of § 1862.

Assuming, without so concluding, that protection of the forest by road building can encompass logging to raise the money, this still does not settle the question whether the present logging program is legal. Two considerations weigh heavily

in balancing the advantages of roads against the dangers of logging. First, roads are not themselves particularly useful in fighting the catastrophic or crown fire. Only nature will suppress such a fire. (The Tillamook Burn area was well roaded.) Second, the road building recommendations of the joint Forest Service/City of Portland fire protection study in 1954 have been more than fulfilled, while fire suppression techniques have substantially improved. The target figure of 250–300 miles in the 1962 FS Route Verification, Govt. Ex. 7, has also apparently been met. Thus, with the use of helicopters and other advanced fire suppression methods, further additions to the present road system would bring rather small benefits. Weighed against the plain dangers from sustained-yield logging, those benefits cannot justify continuation of the logging.

I have concluded, in summary, that the present logging program in the Bull Run Reserve does not protect the forest, whether from landslide, or blowdown, or insects, or disease, or fire. Selective logging may in particular cases protect the forest from particular dangers, but what the Forest Service now permits is not selective. When Congress has imposed a duty to exclude all persons except those affirmatively protecting the forest, it is not enough to make general claims of protective purposes. Plaintiffs have shown, largely from the reports and studies of the federal defendants, that large-scale logging poses serious dangers to the Reserve. The defendants have responded with statements of policy and purpose, not with evidence that establishes a protective practice.[11]

11. Statutory construction has always troubled judges. Even the giants—Holmes, Hand, Cardozo and Frankfurter, to mention only a few—have sometimes been uneasy. *U. S. v. Jin Moy*, 241 U.S. 394, 401–2, 36 S.Ct. 658, 659, 60 L.Ed. 1061, 1064 (1916) (Holmes, J.) *Central Hanover Bank v. Commissioner*, 159 F.2d 167, at 169 (2 Cir. 1947) (Hand, J.) Cardozo, The Nature of the Judicial Process 14–19 (1921). Frankfurter, Some Reflections on the Reading of Statutes, 47 Col.L.Rev. 527, 528–9 (1947).

Frequently, when I wander in search of legislative intent, I feel more like a weary waterwitcher with a defective dowsing rod than, let us say, an explorer with a competent compass and a first-rate set of maps. Perhaps my insecurity as to the intent of the members of Congress in 1904, 1909 and 1948, stems from the results of the statutory construction I have reached in this case.

Enormous side effects are involved, if one looks only at the apprehensions—seemingly

## VII. RELIEF:

Having concluded that the present logging program and recreation is illegal, I intend to enjoin its continuance. Because of the ongoing nature of the logging and recreation programs, and the extended period over which this case has been pending, injunctive relief—and its time of application—must be carefully framed. In addition, since the prohibition of the statute relates generally to the large-scale sustained-yield logging program and to recreation, and since certain types of timber harvest—e. g. blowdown, insect protection, snag removal and other limited types of harvesting—do protect the forest and the water, specification in a decree of permitted activities must be undertaken carefully. An early conference—or hearing—will be scheduled so that I may have the views of counsel on these and other appropriate matters. Counsel should also give consideration to Rule 54(b), and a possible stay of the injunction pending any appeal which may be filed.

The foregoing shall constitute findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a).[12]

well founded—of Clackamas and Hood River Counties, the City of Portland, and the logging industry, as shown by the material offered in support of various intervention requests submitted in this case.

I must derive what comfort I can, therefore, from my sure knowledge that if my findings are clearly erroneous, or my conclusions legally incorrect, the Court of Appeals will, if asked, shortly rectify the matter. And if my construction of this statute survives an appeal, Congress, of course, will be able, by amendment, to change the statute if it agrees with the views of those who think this is not only bad law but bad forestry and perhaps bad economic and environmental policy as well. *See Isaac Walton League v. Butz*, 522 F.2d 945

955 (4 Cir. 1975). I have had occasion elsewhere, *see U. S. v. Washington*, 520 F.2d 676 693 (9 Cir. 1975), to express misgivings about the increasing responsibilities which Federal Judges have been forced to assume, either as a result of Congressional action or otherwise.

**12.** The trial of this second claim went forward without the preparation of a formal pre-trial order. It may well be that one or more of the parties will wish to suggest that a more formalized set of findings and conclusions should be entered, in place of, or in addition to, those contained in this opinion. If so, any such suggestion should be placed in regular motion form.